**Robert YOUNG and David C. Distad**

v.

**NATIONWIDE LIFE INSURANCE COMPANY, American Century Mutual Funds, Inc., American Century Investment Services, Inc., American Century Variable Portfolios, Inc., American Century Investment Management, Inc., and American Century Investment Management International, Ltd.**

**Civil Action No. G–97–628.**

United States District Court,
S.D. Texas,
Galveston Division.

April 27, 1998.

Gregory N. Jones, Franklin Cardwell & Jones, Houston, TX, for Robert Young and David C. Distad.

B. Daryl Bristow, Bristow Hackerman Wilson & Peterson, Houston, TX, Charles C. Platt, Peter K. Vigeland, LeBoeuf Lamb Greene & MacRae, New York City, for Nationwide Life Ins.

Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Kathy D. Patrick, Gibbs and Bruns, Houston, TX, James F. Moyle, Rogers & Wells, New York City, James N. Benedict, Rogers & Wells, New York City, Mark Holland, Rogers & Wells, New York City, for American Century Mutual Funds, Inc., American Century Inv. Services, Inc., American Century Variable Portfolios, Inc., American Century Inv. Management, Inc. and American Century Inv. Management Intern., Ltd.

*ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND CONDITIONAL STAY AND ADMINISTRATIVE CLOSURE*

KENT, District Judge.

This is a class action in which the class member Plaintiffs assert securities violations in addition to various common law causes of action, including breach of contract, fraud, civil conspiracy, and gross negligence. Now before the Court are Defendant Nationwide Life Insurance Company's Motion to Dismiss Plaintiffs' First Amended Complaint,[1] filed January 22, 1998, and the American Century Defendants' Motion to Dismiss the First Amended Complaint, filed January 15, 1998 and amended on January 22, 1998. For the following reasons, both Motions are **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

Plaintiffs Robert Young and David C. Distad are representatives of an alleged class of

1. Although the Motions are based on the First Amended Complaint, Plaintiffs were given leave to file the Second Amended Complaint on April 9, 1998. The Responses to the Motions, and the Replies to the Responses, incorporate the Second Amended Complaint. Therefore, the Court will consider the arguments in the context of the Second Amended Complaint. In the Second Amended Complaint, Plaintiffs eliminated claims based on negligent misrepresentation, common law negligence, and RICO violations. Consequently, those claims will not be addressed in this Order, and for procedural clarity each of those claims is **DISMISSED WITHOUT PREJUDICE.**

purchasers of variable life insurance policies from Defendant Nationwide Life Insurance Company ("Nationwide"). Through its "Best of America Life Planning Series," Nationwide offers variable policies which allow the policy owner to allocate net premiums and cash value to one or more "sub-accounts" of certain variable and fixed accounts. The assets allocated to the sub-account are then used to purchase shares of a designated underlying mutual fund. The variable account mutual fund options offered by Nationwide are managed by, *inter alia,* the following well known mutual fund investment advisors: Dreyfus Corp., Fidelity Management Research Company, Nationwide Financial Services, Neuberger Berman Management Inc., Oppenheimer Management Corp., Strong/Corneliuson Capital Management, Inc., Twentieth Century, and Van Eck Associates Corp. The variable account at issue here is "TCI Portfolios, Inc.," which includes the sub-accounts "TCI Growth," "TCI Balanced," and "TCI International." Nationwide advertises these accounts as a part of "the Twentieth Century Family of Mutual Funds," and all of the Twentieth Century funds are managed by the same investment advisor, Investors Research Corporation, now American Century Investments.[2]

The sub-accounts offered by Nationwide through its Best of America program are mutual funds that offer their shares only to insurance companies. Although the policy owners do not invest directly in the mutual fund, they can allocate their investment to a variable account, and choose the sub-accounts in which they want their premiums invested. The value of their investment is then dependent upon the performance of the particular insurance mutual fund, or "sub-account," they choose. Specifically, the plaintiff policy owners were told by Nationwide:

> As a contract holder, you invest in the mutual funds offered in your life insurance contract. However, you do not buy shares of the mutual fund. Instead, the Account buys shares of the fund and you in turn purchase units of the Account.... The value of your contract can change based on the value of the units you own.

The crux of Plaintiffs' complaint arises from their allegations that the Defendants made material misrepresentations and/or omissions in connection with the marketing and sale of the variable contracts. Specifically, although Plaintiffs acknowledge that they knew they were not investing in publicly traded mutual funds, they claim that the Defendants represented the sub-accounts, or underlying mutual funds, to be "clones" or replicas of well known, publicly traded mutual funds with the same or similar names. Plaintiffs claim that it was their understanding that the "TCI Portfolios" were insurance funds which tracked the investments of the publicly traded "Twentieth Century" Funds. For instance, Plaintiffs claim that Defendants represented the TCI insurance funds "TCI Growth Fund" and "TCI International Fund" to be clones of the publicly traded Twentieth Century Funds with the names "Twentieth Century Growth Fund" and "Twentieth Century International Fund," respectively.

Young, who purchased his policy on December 14, 1992, requested that 100% of his payments be allocated to TCI Growth. Distad purchased two policies on April 17, 1996, and requested that 20% of his payments on each of the policies be allocated to the "20th Century International" fund.[3] In November of 1996, Distad changed mutual fund options, allocating substantial portions of his investment to "Twentieth Cent Growth."[4] Plaintiffs then began tracking their investments, and noticed that the performance of their portfolios differed substantially from the per-

---

2. Although the names of the investment manager and the funds have changed from "Twentieth Century" to "American Century," the Court will use the former names in order to avoid confusion.

3. As stated in Distad's contracts. Nationwide actually allocated the payments to the "TCI International" fund. *See* discussion in Section II. A., *infra.*

4. According to Distad, he decided to make this change based on the performance data of the publicly traded "Twentieth Century Growth" fund, which he acquired by reading the Wall Street Journal, "primarily because of the paucity of timely printed returns results coming from Nationwide."

formance of the publicly traded funds which they believed they had purchased. For instance, in 1996, the TCI Growth Fund owned by Plaintiffs incurred a loss of over 5%, while the Twentieth Century Growth Fund posted a 15% increase. When Distad called Nationwide to inquire as to the differing results between the two funds, he was told that the Nationwide fund was a separate fund with different objectives than the public fund.

Plaintiffs brought this action on October 31, 1997. In their Second Amended Complaint, they allege the following causes of action: (1) violations of § 10(b)[5] of the Securities Act of 1934; (2) violations of the § 35(d)[6] of the Investment Company Act of 1940 ("ICA"); (3) violations of § 36(a)[7] of the ICA; (4) violations of § 34(b)[8] the ICA; (5) fraud; (6) civil conspiracy; (7) breach of contract (against Nationwide only); and (8) gross negligence.

## II. STANDARD FOR MOTION TO DISMISS

When considering a Motion to Dismiss for failure to state a claim, the Court accepts as true all well-pleaded allegations in the complaint, and views them in the light most favorable to the plaintiff. *See Malina v. Gonzales,* 994 F.2d 1121, 1125 (5th Cir.1993). Such motions should be granted only when it appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

## III. FEDERAL SECURITIES LAW VIOLATIONS

### A. *Section 10(b) of the Securities and Exchange Act of 1934*

Plaintiffs allege that Defendants violated § 10(b) of the Securities and Exchange Act of 1934 ("1934 Act") by knowingly making material misstatements or omissions about the relationship between the Nationwide fund and the publicly traded fund, with in-

tent to mislead investors. Section 10(b), the anti-fraud provision of the 1934 Act, provides:

> It shall be unlawful for any person, directly or indirectly, ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance....

■ 15 U.S.C. § 78j(b). Rule 10b–5 "casts the proscription in similar terms." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 172, 114 S.Ct. 1439, 1445, 128 L.Ed.2d 119 (1994). To state a claim under Rule 10b–5, a plaintiff must allege that (1) the defendant made a false misrepresentation or omission, (2) of a material fact, (3) knowing its falsity and intending that the plaintiff rely on it, (4) the plaintiff justifiably relied on the misrepresentation or omission, and (5) the plaintiff suffered damage resulting from this reliance. *Oppenheimer v. Prudential Securities Inc.,* 94 F.3d 189, 194 (5th Cir.1996); *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981).

American Century argues that Plaintiffs' Rule 10b–5 claim fails for two reasons: first, there is no allegation that American Century misrepresented or omitted material facts; and second, there is no allegation that American Century acted with scienter. By incorporation of American Century's Motion to Dismiss, Nationwide makes the same arguments on its own behalf. The Court finds otherwise.

### 1. *Material Misrepresentations or Omissions*

Plaintiff alleges that the Defendants made the following material misstatements. Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds one or all of these allegations sufficient to state a cause of action under Rule 10b–5:

■ (a) The fact that the names of the Twentieth Century Investors ("TCI") Funds, as named in Nationwide's "Best of America" marketing literature, are very nearly identical to the names of the publicly traded Twen-

---

5. 15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b–5 ("Rule 10b–5").

6. 15 U.S.C. § 80a–34(d).

7. 15 U.S.C. § 80a–35(a).

8. 15 U.S.C. § 80a–33(b).

tieth Century funds foreseeably gives rise to great confusion as to whether the insurance funds are clones. This factor alone gives rise to an actionable omission claim; that is, that despite the potential confusion, American Century never clarified that the Twentieth Century Investor funds were not clones or replicas of the Twentieth Century funds.[9] Furthermore, Nationwide never clarified that the TCI funds were not Twentieth Century clones, despite the potential for confusion, especially considering that several of Nationwide's sub-accounts were in fact clones of well known, publicly traded mutual funds.

■ (b) The Initial Registration statement of TCI Portfolios, Inc. states:

> Growth Portfolio and Select Portfolio will, respectively, be managed in the same style as Twentieth Century Growth and Twentieth Century Select. The portfolios of Twentieth Century Growth and Growth Portfolio will include many of the same securities, as will the portfolios of Twentieth Century Select and Select Portfolio.[10] *To the extent practicable the portfolios of Growth Portfolio and Select Portfolio will clone or replicate the portfolio respectively of Twentieth Century Growth and Twentieth Century Select.*

(emphasis added). Defendants argue that the initial registration statement should not be considered because it was later amended, and the quoted language removed, before it became effective. However, it is important for purposes of determining whether the fund names misrepresented the nature of the funds. Because the insurance funds were initially intended to be clones of the publicly traded funds, the names were obviously matched. Although Twentieth Century later decided that the insurance funds would not be clones, it nevertheless consciously decided

to maintain the nearly identical names. This fact gives rise to a genuine issue regarding misrepresentation, and whether there arose a duty to clarify the predictable confusion that could result.

(c) In the Transaction Confirmation Statements sent by Nationwide to Distad, Nationwide consistently referred to his investment in the "Twentieth Century Growth" fund rather than the "TCI Growth" fund.

(d) Nationwide *instructs agents to tell potential clients that its "Best of America" series has "23 funds (clone or retail) ... rated 4 or 5 stars by Morningstar."* Therefore, several of the sub-accounts it offers are in fact clones. This factor may give rise to a duty to clarify which funds are clones and which are not; again, because of predictable confusion.

(e) The name "Best of America," in and of itself, may be misleading. Most investors would assume that the funds in Best of America are indeed the best of America because they are based on the well known mutual funds that carry the same name. In fact, Distad stated that he purchased the policies because of the choice of thirty mutual funds which "were instantly recognizable as some of the best mutual fund groups in America, including 20th Century, Fidelity, Dreyfus, [etc.]." This allegation is strengthened by Plaintiffs' assertions that cloning is a common and well known practice in the mutual fund industry.

(f) The insurance policy issued by Nationwide to David Distad defines a "subaccount" to be "part of a variable account." Each variable account, in turn, "is a separate investment account of the company." With this definition given, the policy then goes on to list the sub-account "Twentieth Cent Growth"[11] as corresponding to the variable

---

**9.** It is also at least somewhat telling that when Distad filled out Nationwide's insurance policy form he specified that 40% of his funds be allocated to "Fidelity Contrafund" and 20% to "20th Century International," which are the, names of publicly traded mutual funds. Upon receipt of this form, Nationwide, apparently without question, allocated 40% of Distad's funds to "Fidelity VIP–2 Contrafund Portfolio" and 20% to "20th Century TCI International Portfolio," the respective names of the allegedly "cloned" insurance funds. (The Fidelity VIP–2 Contrafund actually is a clone, and is not at issue here). This factor at least shows that Nationwide was aware of

possible confusion in its fund names, and should have taken steps to clarify the confusion.

**10.** "Twentieth Century Growth" and "Twentieth Century Select" are the publicly traded mutual funds, while "Growth Portfolio" and "Select Portfolio" are, respectively, the related insurance-only funds.

**11.** Nationwide so named the sub-account in its policy. Although Plaintiffs note the distinction, the Court finds no legitimate difference between "Twentieth Cent Growth" and "Twentieth Centu-

account "20th Century TCI Growth Portfolio," the sub-account "Twentieth Cent Balanced" [12] as corresponding to the variable account "20th Century TCI Balanced Portfolio," and the sub-account "Twentieth Cent Intl" [13] as corresponding to the variable account "20th Century TCI International Portfolio." Therefore, in the Distad contracts, Nationwide misrepresented the insurance sub-accounts as having the *exact same names* as the publicly traded Twentieth Century funds, which are Twentieth Century Growth, Twentieth Century Balanced, and Twentieth Century International.

■ (g) In Nationwide's June, 1997 marketing literature, it consistently referred to its underlying investment fund as "Twentieth Century Growth." It also included an "Investment Performance Summary" of returns dating back ten years. Plaintiffs allege that the figures for "Twentieth Century Growth" annuity fund are actually the figures for the publicly traded Twentieth Century Growth fund. On its face, this allegation establishes a deceptively false and misleading statement by Nationwide.

(h) Plaintiffs allege that Nationwide consistently makes representations to the public that the investments of its "Best of America" contract holders in Twentieth Century Growth would reap the same gains as investors in the publicly traded Twentieth Century Growth fund.

Furthermore, Plaintiffs allege that all of Nationwide's false and misleading statements were made "in cooperation with" American Century.

■ In its Motion to Dismiss, American Century places great emphasis on the disclaimer in the TCI Growth prospectus, which states that the TCI Growth Fund is not publicly traded, but is available only to insurance companies. This factor, however, is completely irrelevant to Plaintiffs' allegation that American Century represented TCI Growth Fund as a clone of the publicly traded fund. American Century also argues that the statements or omissions of Nationwide cannot be attributed to American Century because there is no aider or abettor liability

under Rule 10b–5. While Defendants are correct in asserting that there is no aider and abettor liability under 10b–5, *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), it is not factually clear that American Century did not have a more substantial role in the alleged misrepresentations. Furthermore, some of the Plaintiffs' allegations are sufficient to implicate American Century directly.

Nationwide, for its part, argues that it disclaimed any guarantee of results in both its 1995 and 1992 Prospectuses for the TCI Growth Fund. Once again, Plaintiffs' allegation is not that Nationwide guaranteed results, but that Nationwide represented the TCI Funds as clones of the Twentieth Century Funds that were publicly traded. A disclaimer regarding results has no relevance to alleged misrepresentations about investment strategies and the structure of the fund itself.

#### 2. Scienter

■ Furthermore, the Court finds that scienter has been properly pled in this case. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir. 1996). The Reform Act requires that plaintiffs alleging Rule 10b–5 violations "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u–4(b)(2). Establishing scienter requires a showing that the defendants acted with knowledge or severe recklessness. *See Lovelace,* 78 F.3d at 1018 n. 2 (citing *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir.1981)). Recklessness requires two elements: (1) an extreme departure from the standards of ordinary care, and (2) a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it. *Id.* at 1018.

ry Growth." Any investor would assume that the two are one and the same.

12. *See supra* note 11.

13. *Id.*

■ At a minimum, the allegations listed above establish recklessness on the part of both Defendants. The Court finds that the allegations are also sufficient to imply knowledge. Defendants now assert that the TCI funds are not clones of Twentieth Century Funds, and that they never represented them as such. Defendants did know, however, that some of the insurance funds sold in the annuity contracts were clones, and that cloning is a common industry practice. Defendants should have known that their representations of the funds to be the "Best of America," and their use of nearly identical monikers, posed a danger of misleading investors. The Defendants' use of identical or nearly identical names was done in an industry where cloning is commonplace; an inference arises that they were attempting to associate the insurance funds with the retail funds, despite the fact that the two in fact did not correlate, in order to capitalize on the popularity of the well known publicly traded mutual funds with the same name. These are not "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that.'" See 78 .F.3d at 1019 (such bare allegations are insufficient to meet the heightened pleading requirements of Rule 9(b)). Nor are Plaintiffs' allegations nonspecific to the case at hand. Cf. id. at 1020.

Defendants cite cases which hold that allegations that the defendant acted with the motive and opportunity to make a profit will not suffice to establish scienter. Using case law that rejects allegations that "they did it for the money," American Century attempts to convert the Reform Act's "strong inference" standard into a requirement that the plaintiff prove motive. Finding another motive, however, is not a requirement for establishing scienter. Indeed, it is difficult for the Court to imagine a situation, in securities fraud cases, where the motive would be anything other than financial profit. The cited case law merely stands for the proposition that, absent other factors establishing scienter, a mere motive to make money is insufficient. See Melder v. Morris, 27 F.3d 1097,

1102 (5th Cir.1994) ("Simply put, the *lone allegation* of motive is insufficient.") (emphasis added). In this case, however, Plaintiffs have established the existence of false or misleading statements, along with facts that, in the Court's view, support a strong inference that the Defendants knew that their representations could be interpreted as statements that the insurance funds were clones of the retail funds, aside from any allegations of motive.[14]

### 3. Causation

■ Nationwide argues that Plaintiffs have failed to show causation, finding it critical that the TCI Growth Fund outperformed the Twentieth Century Growth Fund in 1996. Nationwide argues that "the vicissitudes of the market," rather than any misrepresentations on its part, caused the injuries of which Plaintiffs complain. Nationwide confuses legal and factual causation: while market fluctuations may cause the amount of damages in a factual sense, they have no bearing on legal causation. Legal causation, on the other hand, is the causation created by reliance on misrepresentations. If Plaintiffs' allegations are correct, then Defendants' misrepresentations induced them to believe that their investment would track the publicly traded funds, which legally caused any damages they incurred from that investment. Whether the investment did, in fact, consistently perform poorly bears *only* on the question of whether there are any compensable damages.

### B. Investment Company Act of 1940

Defendants first argue that there are no implied private causes of action under § 36(a) or 35(d) of the ICA. Next, they argue that, even if the Court finds that private causes of action do exist, Plaintiffs lack standing under the Act because Nationwide, not Plaintiffs, is the investor. Next, Defendants argue that Plaintiffs' substantive allegations do not state a claim under the ICA. Finally, Nationwide argues that the ICA ap-

---

**14.** Furthermore, if Plaintiffs' allegations are true that Defendants provided performance summary data of the publicly traded fund in marketing literature for the insurance fund, in light of Defendants' contentions that the insurance fund was never intended as a clone, fraud is conclusively established. Defendants' objections to this allegation, that the literature at issue was actually an advertisement for the publicly traded fund, is an issue of fact to be saved for a later date.

plies only to registered investment companies, and is therefore not applicable to an insurance company such as Nationwide.

### 1. Nationwide's Status as an "Investment Company"

■■■ The Court first addresses Nationwide's argument that, as an insurance company, it cannot be held liable under the ICA because the ICA applies only to "registered investment companies" or their officers, directors, and investment advisors. *See* 15 U.S.C. § 80a–35(a)(1), (2).[15] The ICA excepts insurance companies from the definition of "investment company." *See* 15 U.S.C. § 80a–3(c)(3). Although Plaintiffs have completely failed to respond to this argument, the Court finds it utterly unpersuasive.

First, several cases have held or implied that the *funds* created by the issuance of variable annuity contracts are "investment companies" under the ICA. In *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), the Supreme Court held that certain types of variable annuity contracts are not insurance contracts. Therefore, the issuers of such contracts fit under the definition of "investment company." In another case, the Third Circuit persuasively held that an investment fund resulting from the sale of variable annuity contracts to members of the public by an insurance company, very similar to the funds at issue here, was an "investment company." *See Prudential Ins. Co. v. SEC*, 326 F.2d 383 (3d Cir.1964).

In the 1995 and 1992 Prospectuses for Nationwide's "Best of America" Policy, Nationwide states that it has "caused the Variable Account to be registered with the [SEC] as a unit investment trust *pursuant to the provisions of the Investment Company Act of 1940.*" (emphasis added). Therefore, according to Nationwide's own marketing literature, the "variable accounts" that Nationwide owns are registered investment companies, and subject to the ICA. Section 36(a) of the ICA makes clear that the principal underwriter of a unit investment trust can be liable under its provisions. *See* 15

---

**15.** As explained *infra*, § 36(a) also applies to the principal underwriter of a unit investment trust.

U.S.C. § 80a–35(a)(2). Nationwide's arguments that it cannot be held liable under the ICA are therefore blatantly false, and borderline deceptive.

### 2. Existence of a Private Cause of Action Under § 36(a)

The Court must first determine whether there is a private cause of action under § 36(a) of the ICA. That section provides:

The [Securities and Exchange] Commission is authorized to bring an action in the proper district court of the United States ... alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts—

(1) as officer, director, member of any advisory board, investment adviser, or depositor....

If such allegations are established, ... the court may ... award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a–1(b) of [the ICA].

15 U.S.C. § 80a–35(a).

Defendants argue that, under strict statutory construction principles, § 36(a) does not provide a private cause of action; that is, by specifying that the Securities and Exchange Commission ("SEC") may bring judicial actions, Congress did not intend to provide for a private parties to be empowered under this section. Defendants support their argument with the recent Supreme Court decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

In a 5–4 decision, the *Central Bank* Court adhered to a strict textualist approach to statutory interpretation to find that Congress did not intend to provide for aider and abet-

*See* 15 U.S.C. § 80a–35(a)(2).

tor liability under Rule 10b–5. In so holding, the Court overturned literally decades of unanimous case law to the contrary, and stunned courts, lawyers and academics alike. *See, e.g., Whirlpool Financial Corp. v. GN Holdings, Inc.,* 873 F.Supp. 111, 119 (N.D.Ill. 1995) (*Central Bank* "struck the securities bar like a thunderbolt because it was so unexpected"); Robert A. Prentice, *Locating that "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b),* 75 N.C.L.Rev. 691, 691 (1997) ("In ruling that there is no aiding and abetting liability under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, the Court overturned thirty years of precedent and seemingly freed securities professionals from a kind of statutory sword of Damocles.").

In reaching its conclusion, the *Central Bank* Court analyzed the case law addressing § 10(b) and Rule 10b–5, noting that two main issues have been confronted: first, determining the scope of conduct prohibited by § 10(b); and second, determining the elements of the cause of action. Critically, the Court stated that "[t]he latter issue ... has posed difficulty *because Congress did not create a private § 10(b) cause of action and had no occasion to provide guidance about the elements of a private liability scheme.* We thus have had 'to infer how the 1934 Congress would have addressed the issue[s] had the 10b–5 action been included as an express provision in the 1934 Act.'" *Central Bank,* 511 U.S. at 173, 114 S.Ct. at 1446 (citation omitted) (emphasis added) (alteration in original); *see* Nathan F. Coco, Comment, *Has Legislative History Become History?: A Critical Examination of* Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 20 J.Corp.L. 555, 565 (1995) ("It is difficult to reconcile [the Court's method of interpretation] with the Court's recognition of a private cause of action under

section 10(b) of the 1934 Act and Rule 10b–5 generally."). The Court recognized that such a cause of action had been implied, calling it "the most familiar private cause of action: the one we have found to be implied by § 10(b)." *Central Bank,* 511 U.S. at 171, 114 S.Ct. at 1445.

Without determining whether implying a private cause of action under § 10(b) is proper under its new method of interpretation,[16] the Court went on to the first issue, determining the scope of conduct prohibited by § 10(b), and stated that with regard to *that* issue, "the text of the statute controls our decision." *Id.,* 511 U.S. at 173, 114 S.Ct. at 1446. Thus, *Central Bank* does *not* stand for the principle that causes of action may not be judicially implied without textual support; the Court merely applied the strict textualist approach to discerning the statute's scope of prohibited conduct.

The fact that the Court left intact the 10b–5 cause of action, where clearly not provided for in the text, sheds considerable doubt on Defendants' arguments here. The question of whether a private cause of action exists under § 36(a) of the ICA is much more closely analogous to the existence of a cause of action under § 10(b) of the 1934 Act than to the issue actually addressed by *Central Bank,* the scope of conduct prohibited by the Act. And the Court's presumption that a § 10(b) cause of action exists, despite its strict textualist approach, bolsters the existence of the private cause of action asserted here.[17]

Moreover, the only courts to address the issue in light of *Central Bank* have decided that a private cause of action does exist under § 36(a). *See Strougo v. Scudder, Stevens & Clark, Inc.,* 964 F.Supp. 783, 796–97 (S.D.N.Y.1997); *In re Nuveen Fund Litigation,* No. 94–360, 1996 WL 328006, *3–5 (N.D.Ill.1996).[18] In *Strougo,* the court pre-

16. The Court merely cited to *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971) as authority for a private right of action.

17. The Supreme Court's acceptance of an implied right of action under § 10(b) was bolstered by the fact that a later Congress enacted a statute that acknowledged the implied right. *See* 15 U.S.C. § 78aa–1. As discussed *infra,* a later Con-

gress has also expressed its expectation that courts will imply private rights of action under the ICA.

18. Plaintiffs also cite to *Seidel v. Lee,* 954 F.Supp. 810, 818–19 (D.Del.1996) as a recent post-*Central Bank* decision that has recognized the existence of an implied private right of action under § 36(a). While technically *Seidel* did come after *Central Bank,* the decision to find a private cause of action under § 36(a) was made in an order in

sented a well reasoned and thoughtful opinion for the existence of a private cause of action. That court found it critical that *Central Bank* addressed the scope of conduct prohibited by a statute, and not the existence of implied rights of action. *Strougo,* 964 F.Supp. at 796. *Strougo* also found determinative subsequent legislative history acknowledging a private cause of action. *Id.* at 797–98.

■■■ This Court is also persuaded that a private cause of action should and does exist under § 36(a) of the ICA. First, the majority of federal courts had recognized implied rights of action under § 36(a) prior to *Central Bank. See, e.g., Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.,* 825 F.2d 731 (3d Cir.1987); *Fogel v. Chestnutt,* 668 F.2d 100 (2d Cir.1981); *Esplin v. Hirschi,* 402 F.2d 94, 103 (10th Cir.1968); *Brown v. Eastern States Corp.,* 181 F.2d 26 (4th Cir.1950). The First Circuit has recognized a private right of action under § 17(a)(2) of the ICA. *See Lessler v. Little,* 857 F.2d 866, 873 (1st Cir.1988) (agreeing with the Second and Third Circuits that "it is consistent with congressional intent and with governing law to imply a private cause of action under the Investment Company Act"). The Supreme Court has assumed without deciding that private causes of action exist under the ICA. *See Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 97 n. 4, 111 S.Ct. 1711, 1717 n. 4, 114 L.Ed.2d 152 (1991). The Eighth Circuit appears to be the only court to have found that the ICA does not provide for private enforcement. *See Brouk v. Managed Funds, Inc.,* 286 F.2d 901, 918 (8th Cir.1961), *vacated as moot by agreement,* 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962). Because *Central Bank* did not address this issue, it did not overrule the governing authority regarding ICA causes of action.

Second, as pointed out in *Strougo,* the legislative history of the ICA lends strong, even definitive, support that Congress did intend courts to infer private causes of action under § 36(a). In the legislative history of the Small Business Investment Incentive Act

of 1980, amending the ICA, the legislative committee stated:

> The Committee wishes to make plain that it *expects the courts to imply private rights of action under this legislation,* where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the [ICA]. With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H.R.1341, 96th Cong. at 28–29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4810–11 (emphasis added), *quoted in Strougo,* 964 F.Supp. at 798. Furthermore, when § 36 was amended in 1969 and an express private remedy was added to subsection (b), the legislative history indicates that "the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)." S.REP. No. 91–184, at 16 (1969). Courts have interpreted this to mean that Congress did not intend to eliminate the judicially implied private remedy under subsection (a). *See, e.g., Bancroft,* 825 F.2d at 735–36; *Fogel,* 668 F.2d at 112; *Tannenbaum v. Zeller,* 552 F.2d 402, 417 (2d Cir.1977).

Defendants, citing *Central Bank,* assail this legislative history as unpersuasive because it was not promulgated contemporaneously with the statute. While *Central Bank* did express misgivings about relying on subsequent legislative history to interpret a statute, it acknowledged that its cases have been inconsistent in using subsequent history and congressional inaction. *Central Bank,* 511 U.S. at 187, 114 S.Ct. at 1453. Moreover, it

---

a previous, related case. *See id.* at 818; *In re ML–Lee Acquisition Fund II, L.P. Litigation,* 848 F.Supp. 527, 542 (D.Del.1994). The prior order was issued on March 31, 1994, nineteen days

before *Central Bank* was decided. Obviously, then, the *Seidel* court's decision to find a 36(a) cause of action did not rest upon a *Central Bank* analysis.

ultimately rejected arguments based on "oblique references" and inaction because "the competing arguments here would not point to a definitive answer." *Id.* In this case, there is only one definitive answer that can be gleaned from the legislative history of the 1980 amendments: Congress expects courts to imply private rights of action.[19] The Court cannot ignore such strong Congressional sentiments.

Finally, § 36 itself grants the courts broad power to enforce its provisions when the elements of the cause of action are established, "having due regard to the protection of investors and to the effection of the [ICA's] policies." 15 U.S.C. § 80a–35(a). Those policies declare that:

> [u]pon the basis of facts disclosed by the record and reports of the [SEC] ... and facts *otherwise disclosed and ascertained,* it is declared that the national public interest and the interest of investors are adversely affected—
>
> (1) when investors purchase ... securities issued by investment companies without adequate, accurate, and explicit information, fairly presented, concerning the character of such securities.

The Court feels that private rights of action are important in effectuating the policies of the ICA. For all of the reasons stated above, the Court finds that a private cause of action exists under § 36(a) of the ICA.

### 3. *Standing*

Defendants argue that Plaintiffs lack standing to bring claims under the ICA because they did not directly invest in the insurance funds at issue; rather, they purchased policies from Nationwide, and Nationwide invested in the funds. Nationwide's marketing materials tell the investors "[a]s a contract holder, you invest in the mutual funds offered in your annuity contract. However, you do not buy shares of the mutual fund. Instead, the Account buys shares of the fund and you in turn purchase units of the Account." Plaintiffs argue that they possessed a beneficial interest in the insurance funds, and therefore are within the class of persons that the ICA was designed to protect.

■ The Supreme Court has posed the essential inquiry into the constitutional requirement of standing as: "have the [plaintiffs] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends ...?" *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The constitutional minimum for standing involves three elements: (1) an "injury in fact"; that is, "an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical' "; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards,* 128 F.3d 910, 915–16 (5th Cir.1997).

■ While technically Plaintiffs do not have a legal interest in the investments at issue, it is clear that the total value of their insurance policy would rise and fall with the value of the underlying investment options they chose. The insurance policy sent to Distad by Nationwide states "[t]he Contract Value will change with a change in the investment results of the Subaccounts." The policyholder's success was therefore contingent upon the success of the insurance fund itself. A breach of fiduciary duty, as contemplated in the ICA, would have a direct impact upon the policyholder. As Plaintiffs point out, they are actually the *only* persons with standing, because their alleged injuries are the most direct. Nationwide itself would not be injured, other than indirectly by loss of reputation and/or business. If Plaintiffs do not have standing to bring ICA claims, then no person does. The Court therefore holds that the Plaintiffs do have standing.[20]

---

**19.** As stated by one court, the subsequent legislative history of § 36(a) demonstrates an "enthusiastic expression of [congressional] intent" that "provides more than mere silence or legislative inaction." *Nuveen,* 1996 WL 328006, at *6.

**20.** Defendants cite several cases to bolster their standing argument, none of which involve similarly situated plaintiffs. *See, e.g., Herpich v. Wallace,* 430 F.2d 792 (5th Cir.1970) (minority shareholders asserting ICA violations against ma-

#### 4. Failure to State a Claim Under § 36(a) of the ICA

Defendants next argue that Plaintiffs cannot prevail in their ICA cause of action because their allegations do not state violations of the statute. First, Defendants claim that Plaintiffs' allegations do not encompass "a breach of fiduciary duty involving personal misconduct," as required by § 36(a) of the ICA. 15 U.S.C. § 80a–35(a). According to Defendants, the term "personal misconduct" requires that self-dealing or personal impropriety be alleged. In Response, Plaintiffs argue first that their allegations do involve personal misconduct, and second, that § 36(a) requires only that a general breach of fiduciary duty be alleged.

▮ The Court refuses to limit § 36(a)'s scope to only those violations that involve self-dealing or personal impropriety, especially at this stage of the proceedings. First, the legislative history supports a reading of the statute that any "nonfeasance of duty or abdication of responsibility would constitute a breach of fiduciary duty involving personal misconduct." S.REP. No. 91–184, at 16 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4931, *quoted in Nuveen,* 1996 WL 328006, at *12; *see also* H.R.REP. No. 96–1341, *reprinted in* 1980 U.S.C.C.A.N. 4800, 4808 ("The Committee believes that the type of misconduct covered by [§ 36(a) ] ... extends to personal misconduct evidenced by misfeasance or nonfeasance in carrying out legal responsibilities *as well as self-dealing* and other examples of unjust enrichment."), *quoted in Nuveen,* 1996 WL 328006, at *12 n. 7 (emphasis added).

Considering the structure and purpose of the ICA, "that Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interests of the funds'

shareholders," *Burks v. Lasker,* 441 U.S. 471, 484–85, 99 S.Ct. 1831, 1840–41, 60 L.Ed.2d 404 (1979), it would be inconsistent to find that liability could only attach where self-dealing or conflicts of interest are involved, if the interests of the protected class were not adequately defended.

To support their argument that § 36(a) only encompasses self-dealing or conflicts of interest, Defendants have cited one case that found a violation of § 36(a) where such conduct was involved.[21] *See SEC v. Commonwealth Chem. Securities, Inc.,* 410 F.Supp. 1002, 1018 (S.D.N.Y.1976), *aff'd in part, modified in part,* 574 F.2d 90 (2d Cir.1978). However, none of the authority cited by Defendants analyzes or discusses the "personal misconduct" standard. In fact, Defendants have failed to cite to any authority rejecting a claim where self-dealing or conflicts of interest are not involved, aside from language from a Senate Committee hearing stating that "some clearcut personal impropriety" is required.

Furthermore, even if more than a general breach of fiduciary duty is required, the Court finds that Plaintiffs' allegations regarding personal misconduct are sufficient to support the existence of a cause of action.

Accordingly, for each of the reasons stated above, Defendants' Motions to Dismiss Plaintiffs' claims under § 36(a) of the ICA are **DENIED.**

#### 5. Failure to State a Claim Under § 35(d) of the ICA

▮ Defendants next argue that Plaintiffs have failed to allege the essential elements of a cause of action under § 35(d) of the ICA. That section provides:

It shall be unlawful for any registered investment company to adopt as a part of the name or title of such company, or of

jority shareholder); *Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 794 (8th Cir.1967) (plaintiffs had no injuries and no interest whatsoever in voting trust controlled by defendants); *Avnet, Inc. v. Scope Indus.,* 499 F.Supp. 1121, 1126 n. 8 (S.D.N.Y.1980) (defendant company was a shareholder of plaintiff company, so plaintiff had no direct interest). In the cases cited by Defendants, standing to sue was denied because the damage allegedly suffered by the plaintiffs was

outside the scope of interests protected by the ICA. *See, e.g., Goodall v. Columbia Ventures, Inc.,* 374 F.Supp. 1324, 1328 (S.D.N.Y.1974). In this case, Plaintiffs are clearly within the scope of interests to be protected, in that they had beneficial ownership in the funds.

**21.** Although Defendants cited two other cases, one is an unpublished opinion, and the other is merely an SEC litigation release.

any securities of which it is the issuer, any word or words that the *Commission finds* are materially deceptive or misleading.

15 U.S.C. § 80a–34(d) (emphasis added). Defendants argue that Plaintiffs can have no claim under § 35(d) unless the SEC has found the name of the fund to be materially deceptive or misleading. Because the SEC has not addressed the lawfulness of the names of the funds at issue, under Defendants' argument the Plaintiffs have no cause of action under § 35(d). Defendants cite two cases to support their argument, both of which address only the term "interested persons" under 15(f) of the ICA, and are not, therefore, directly on point. *See Block v. SEC*, 50 F.3d 1078 (D.C.Cir.1995); *Olesh v. Dreyfus Corp.*, No. CV–94–1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995).[22]

Plaintiffs argue that an implied private right of action exists under § 35(d) and that no prior SEC determination is required, based on two cases that implied such a right of action. *See Monheit v. Carter*, 376 F.Supp. 334 (S.D.N.Y.1974); *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472 (3d Cir. 1963). Plaintiffs argue that these decisions, coupled with "congressional silence," evidence Congress's intent that an implied private right of action does not require an explicit SEC finding.

The Court is not persuaded that Congress intended such a result. First, *Monheit* and *Taussig* did not expressly hold that a private right of action exists under § 35(d) even without an SEC finding. *Taussig* merely found the federal claim under § 35(d) substantial enough to justify the district court in taking pendent jurisdiction over the common law claim. *Taussig*, 313 F.2d at 476. Because relief was sought and granted solely on the common law, "it was unnecessary for the court in *Taussig* to determine finally whether or not § 35(d) gave rise to a private claim or cause of action in a federal court." *Monheit*,

376 F.Supp. at 340. *Monheit* adhered to this reasoning, stating that "[e]ven assuming that a private right were not created by § 35(d) ... this court can take pendent jurisdiction of the issues raised in this count since the claim is sufficiently related to the other federal claims pleaded in the complaint." *Id.* Therefore, neither case supports Plaintiffs' contentions that an SEC finding is not required for a § 35(d) cause of action.

In this case, the Court cannot deny the clear import of the text. Section 35(d) unequivocally prohibits the use of "any word or words that the *Commission finds* are materially deceptive or misleading." 15 U.S.C. § 80a–34(d) (emphasis added). The words of the statute are subject to no other interpretation than that which requires an SEC finding before a party can be found liable. *See Central Bank*, 511 U.S. at 175, 114 S.Ct. at 1447 (statutory text controls the definition of conduct prohibited by the securities laws). Where Congress requires that the SEC make a finding of prohibited conduct, the Court cannot find otherwise. Accordingly, Defendants' Motions to Dismiss Plaintiffs' claim under § 35(d) of the ICA are **GRANTED**, and such claim is **DISMISSED WITH PREJUDICE** as to all Defendants.

## IV. COMMON LAW CAUSES OF ACTION

### A. *Fraud*

▇▇▇▇ Defendants' Motion to Dismiss the common law fraud claims is contingent upon Defendants' argument that Plaintiffs do not state a claim for statutory fraud. "[T]he only element that distinguishes statutory fraud from common law fraud is the additional requirement for statutory fraud that the alleged fraudulent activity must be made in connection with a particular purchase or sale of a security." *Oppenheimer v. Prudential Securities Inc.*, 94 F.3d 189, 195 (5th Cir. 1996) (citing *Blue Chip Stamps v. Manor*

---

22. Furthermore, only one of the cited cases, *Olesh*, actually holds that an SEC determination that a director is an "interested person" is a prerequisite to bringing a private cause of action under § 15(f). In *Block*, the plaintiffs challenged the SEC's decision not to hold a hearing to determine whether certain directors were "interested persons" within the meaning of § 2(19) of the ICA. The court determined that the SEC's decision not to hold a hearing was within its discretion, and therefore the plaintiffs could not bring a claim under § 15(f) of the ICA. Critically, however, the court assumed without deciding that the plaintiffs were "correct in maintaining that a private action to enforce § 15(f)(1) cannot go forward without the SEC having first issued an order declaring that more than 25 percent of the directors are 'interested persons.'" *Block*, 50 F.3d at 1083.

*Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1315 (5th Cir.1977)). Because the Court has found Plaintiffs' allegations sufficient to support a cause of action for statutory fraud under § 10(b), the allegations are also sufficient to support a common law fraud cause of action. Accordingly, Defendants' Motions to Dismiss Plaintiffs' common law fraud claims are **DENIED.**

## B. *Civil Conspiracy*

Defendants' Motions to Dismiss Plaintiffs' civil conspiracy claims are contingent on their argument that Plaintiffs have failed to allege any intentional acts of wrongdoing. Because the Court has found otherwise, Defendants' Motions to Dismiss Plaintiffs' civil conspiracy claims are **DENIED.**

## C. *Breach of Contract*

Plaintiffs assert breach of contract claims only against Defendant Nationwide, as American Century was not a contracting party to the insurance policies. In its Motion to Dismiss, Nationwide argues that the parol evidence rule prohibits consideration of anything other than the contract, and Plaintiffs cannot show that any contract terms have been breached.

▮▮▮▮ First, as recognized earlier, Plaintiff Distad's policy contracts refer to the Twentieth Century sub-accounts using the names of the publicly traded Twentieth Century funds. This raises a fact issue as to breach of contract. Next, the parol evidence rule does not apply in this case. The parol evidence rule has been stated as follows: "When parties have concluded a valid integrated agreement with respect to a particular subject matter, the rule precludes the enforcement of inconsistent prior or contemporaneous agreements." *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (Tex.1958), *quoted in F.D.I.C. v. Wallace,* 975 F.2d 227, 229 (5th Cir.1992). However, the parol evidence rule does not apply when assent to the contract was induced by fraud or mistake. *See Wallace,* 975 F.2d at 229; *Dallas Farm Machinery Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233 (Tex.1957).[23] Because Plaintiffs here allege fraud, the parol evidence rule does not apply. Furthermore, the allegations that the Court has found sufficient to state a claim for fraud are also sufficient to state a claim for breach of contract. Those alleged misrepresentations, if relied upon by Plaintiffs, are sufficient to form the basis of a valid breach of contract claim based on fraud in the inducement. Accordingly, Nationwide's Motion to Dismiss Plaintiffs' breach of contract claim is **DENIED.**

## D. *Gross Negligence*

▮▮▮▮ Gross negligence has been defined as the "entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Bennett v. Howard,* 141 Tex. 101, 170 S.W.2d 709, 713 (Tex.1943). It requires that the actor has subjective actual knowledge of an objectively extreme risk created by his behavior. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 21 (Tex.1994). "The 'extreme risk' prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather 'the likelihood of serious injury' to the plaintiff." *Id.* (quoting *Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993)). The possibility that Plaintiffs could suffer a decline in the value of their insurance policies and annuities does not even begin to rise to the level of extreme risk or conscious indifference required for gross negligence. Accordingly, Plaintiffs' claim of gross negligence is hereby **DISMISSED WITH PREJUDICE.**

## V. CONCLUSION

For the reasons stated above, the Defendants' Motions to Dismiss are **GRANTED** as

---

23. For purposes of this Motion to Dismiss, the Court applies Texas law, as there is apparently no choice-of-law provision in the contracts at issue. *See Amoco Chemical Co. v. Tex Tin Corp.,* 925 F.Supp. 1192, 1202 n. 9 (S.D.Tex.1996). However, this does not preclude the possibility that other states' laws may apply to the supple-mental claims in this case. *See De Aguilar v. Boeing Co.,* 47 F.3d 1404 (5th Cir.1995) (listing choice-of-law rules Texas courts apply in determining which state's law governs). At this stage of the proceedings, however, the Court is unable to make an informed choice-of-law decision.

to Plaintiffs' claim under § 35(d) of the ICA and gross negligence claim, and those claims are **DISMISSED WITH PREJUDICE** as to all Defendants. Furthermore, Plaintiffs' claims of negligent misrepresentation, common law negligence, and RICO violations are **DISMISSED WITHOUT PREJUDICE.** The Motions to Dismiss are **DENIED** in all other respects. The parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date. It is also **ORDERED** that the parties file nothing further regarding the issues herein considered and the claims dismissed in this Order, including motions to reconsider and the like, unless supported by *compelling* new evidence not available at the time of the instant submissions.

Finally, despite the foregoing rulings, the Court notes that the Fifth Circuit has never directly ruled on three critical issues addressed in this Order: first, the question of whether a cause of action exists under § 36(a) of the ICA, either before or after *Central Bank;* second, whether the term "personal misconduct" in § 36(a) of the ICA requires self-dealing or personal impropriety; and third, whether § 35(d) requires an SEC finding of "materially deceptive or misleading" names before a private action may be brought. The Federal Rules of Civil Procedure state that:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

It is clear from the foregoing discussion that the existence of a cause of action under § 36(a) of the ICA allows for considerable difference of opinion, given the paucity of case law on the issue since *Central Bank.* Furthermore, the Court recognizes that the other two issues listed above may similarly allow for differences of opinion. Accordingly, and while not abrogating its obligation to handle matters on its own docket fairly and expeditiously, but rather with an eye toward maximizing efficiency and minimizing expense, and deferring to the wisdom of the Fifth Circuit in establishing policy, the Court feels that an interlocutory appeal of the Order regarding these three issues would be appropriate to best save the parties potentially tens or even hundreds of thousands of dollars in litigating this case, only to have the outcome overturned on appeal for the reason that no such causes of action exist. Accordingly, pursuant to 28 U.S.C. § 1292(b), the parties have ten (10) days from the date of this Order[24] to appeal the issues of (1) the existence of a cause of action under § 36(a) of the ICA; (2) the standard required for "personal misconduct" under § 36(a); and (3) the requirement of an SEC finding in § 35(d) of the ICA. No other issues addressed in this Order shall be interlocutorily appealable; however, because the Court again wishes to minimize expense and inconvenience of the parties, this case is hereby **STAYED** and **ADMINISTRATIVELY CLOSED** pending such appeal. The case will be reopened upon determination of the appealable issues by the Fifth Circuit, or, if no appeal is filed, upon timely motion by any party.

**IT IS SO ORDERED.**

---

**24.** While frankly the Court would allow the parties twenty days to appeal, the Court is limited by the express ten-day provision in the statute.