United States Court of Appeals,

Fifth Circuit.

No. 95-50887

Summary Calendar.

Kaye Butler OPPENHEIMER, Plaintiff-Appellant,

v.

PRUDENTIAL SECURITIES INCORPORATED, also known as Prudential Bache Securities, Inc.;  and Robert E. Green, Defendants-Appellees.

Sept. 6, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before GARWOOD, WIENER, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

FACTS

In March of 1987, Kaye B. Oppenheimer ("Oppenheimer"), opened an account with Thomson McKinnon Securities ("TMS").  Robert E. Green[1] ("Green"), served as Oppenheimer's stockbroker while her account was maintained at TMS.  After opening the account with TMS, Oppenheimer purchased approximately 11 separate securities over a two-year period.

On or about July 17, 1989, TMS and Prudential Securities Incorporated ("Prudential") entered into an asset purchase agreement (the "Asset Purchase Agreement"), to be effective on or about September 22, 1989.  In that agreement, Prudential agreed to purchase the business premises and fixed assets of TMS as well as certain related leases and contracts.  In addition, Prudential agreed to hire certain former TMS employees whom it found acceptable.  As a result, Prudential hired Green.  Because Oppenheimer did not provide TMS with instructions regarding the disposition of her account, Prudential opened and maintained that account.  Oppenheimer kept her account at Prudential

---

[1]Oppenheimer's claims against Green were dismissed after the trial court granted Green's motion to compel arbitration.  Accordingly, this appeal is limited to a determination of the claims between Oppenheimer and Prudential.

until July of 1992, at which time she transferred her investments to another brokerage firm.

On or about August 12, 1993, Oppenheimer filed her Original Complaint. In her Original Complaint, Oppenheimer asserted a laundry list of claims against TMS, Green, and Prudential, but complained of only three specific transactions, all of which were initiated at TMS in March of 1987, or earlier. Oppenheimer also accused Green and Prudential of mismanagement of her account after it was transferred to Prudential, but did not plead any facts with respect to the purported mismanagement. Oppenheimer subsequently entered into an agreement with Prudential and Green wherein the parties agreed that Prudential and Green would not be required to respond to the Original Complaint until Oppenheimer amended. Oppenheimer filed her First Amended Original Complaint on September 21, 1994.

Oppenheimer's First Amended Original Complaint was virtually identical to the Original Complaint except that it identified eleven other TMS transactions of which she complained. In addition, she identified two transactions that occurred wdential. Further, Oppenheimer claimed Prudential was liable as a successor-in-interest for the TMS transactions because of the existence of an indemnity provision in the Asset Purchase Agreement.

Prudential filed its Motion to Dismiss for Failure to State a Claim, or in the Alternative, Motion for Summary Judgment and Motion for a more definite statement. In its Motion to Dismiss, Prudential sought to have all claims relating to the TMS transactions dismissed, or in the alternative, denied by summary judgment as a matter of law. Prudential also requested that Oppenheimer's Prudential transactions be dismissed because it contended that she had incurred no loss from those investments. Finally, Prudential requested that Oppenheimer be required to replead with greater particularity the nature of her fraud claims, because Prudential contended that those claims lacked meaningful factual support.

The trial court granted Prudential's motion to require Oppenheimer to replead her claims relating to Rule 10b-5 and § 10(b) of the Securities Exchange Act of 1934, her breach of fiduciary

duty claims, her breach of contract claims, and her negligence claims against Green and Prudential.[2] In addition to requiring Oppenheimer to replead, the court also required Prudential to state which of the transactions, of which Oppenheimer complained, had actually occurred while Prudential maintained her account. Oppenheimer then filed her Second Amended Original Complaint.

Oppenheimer's Second Amended Original Complaint varied little from the First Amended Complaint. Oppenheimer reasserted a laundry list of purported causes of action including: (i) violations of federal securities laws; (ii) constructive fraud; (iii) breach of fiduciary duty; (iv) common law and statutory fraud; (v) violations of the Texas Deceptive Trade Practices Act ("DTPA"); (vi) breach of implied warranty of fitness for a particular purpose; (vii) breach of contract; and (viii) negligence.

In response to the Second Amended Original Complaint, Prudential re-urged its Motion to Dismiss and offered summary judgment evidence of the following: (i) that Prudential was not legally responsible for TMS Transactions; (ii) that many of the complained of TMS transactions were never even transferred to Prudential; (iii) that even assuming Oppenheimer's allegations with respect to her Prudential transactions were true, Oppenheimer's monthly statements provided her with notice of any failure of Green or Prudential to honor her instructions regarding the purchase of these investments; and (iv) that Oppenheimer sustained no damages from her Prudential transactions.

Oppenheimer responded by offering evidence of Prudential's crediting of certain of its customer accounts victimized by an embezzlement scheme (hereinafter referred to as the "Saddlebrook incident"). She contended that this evidence demonstrated that Prudential was liable as a successor-in-interest for all TMS transactions occurring before the date of the Asset Purchase Agreement.[3] The Saddlebrook incident involved a TMS cashier embezzling funds from TMS

_____

[2]Pursuant to a court order, all matters in connection with this action were referred to a magistrate on December 1, 1994. Because the district court ultimately adopted all of the magistrate's findings in this action, all references are to the "trial court."

[3]This evidence consisted of a list of certain Prudential customer accounts credited and a letter from an in-house counsel at Prudential to the New York Stock Exchange enclosing a supplemental list of credited accounts and containing a brief explanation with respect to

accounts from a Saddlebrook, New Jersey office. Soon after the transfer of certain TMS accounts to Prudential, Prudential discovered the scheme, confronted the cashier, and ultimately elected to make restitution to its aggrieved customers.

Oppenheimer claimed the reimbursement of accounts was inconsistent with Prudential's claim that it had no successor-in-interest liability. Oppenheimer further argued that "Prudential ... waived any right [it] may have had to claim that it did not assume [TMS] liabilities...." Addressing Oppenheimer's "waiver" argument, the court ruled that evidence relating to the Saddlebrook incident was inadmissible based on Oppenheimer's failure to properly serve Prudential with an executed subpoena by which Oppenheimer obtained evidence of the reimbursements. Further, the court found that the evidence of reimbursement would be inadmissible pursuant to Fed.R.Evid. 408. Finally, the court found that, even if admissible, the Saddlebrook incident was totally unrelated to Oppenheimer's claim of successor liability and provided no issue of fact with respect to Prudential's liabilities for TMS transactions. As a result, the court granted Prudential's motion for summary judgment with respect to the TMS transactions. The court dismissed the remainder of Oppenheimer's claims relating to her Prudential transactions because Oppenheimer was unable to support her allegations of misrepresentations regarding those transactions.

Addressing Oppenheimer's breach of fiduciary duty claims, the court found the facts pled by Oppenheimer in support of those claims insufficient to establish the existence of any fiduciary duty. The court specifically noted that Oppenheimer failed to identify any specific acts which would impose liability on Prudential for any acts of Green. Because no contract existed between Oppenheimer and Prudential or Green, the court dismissed her breach of contract claims. Fiegligence claims because she failed to state a cause of action for negligence against Prudential. Oppenheimer appealed.

DISCUSSION

I. Successor-In-Interest Liability

---

Prudential's discovery of a cashier's misappropriation of customer funds from Prudential accounts.

On appeal, Oppenheimer challenges the district court's decision to grant Prudential's motion for summary judgment on the issue of successor-in-interest liability. She argues that the court erred when it: (1) determined that evidence of the Saddlebrook incident was inadmissible as a result of Oppenheimer's failure to properly serve Prudential with notice of her subpoena to the New York Stock Exchange ("NYSE"); (2) found that evidence of Prudential's decision to settle claims arising from the Saddlebrook incident was inadmissible under Fed.R.Evid. 408; (3) determined that Prudential's decision to pay victims of the Saddlebrook incident did not result in a waiver of its right to claim that it had not assumed the liabilities of TMS; and (4) held that the Asset Purchase Agreement did not indicate that Prudential assumed the liabilities of TMS.

We conduct a de novo review of a district court's grant of summary judgment. *Fireman's Fund Ins. Co. v. Murchison,* 937 F.2d 204, 207 (5th Cir.1991). No deference is given to the district court and all reasonable inferences from the evidence must be resolved in favor of the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 665, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

We will assume, *arguendo,* that Oppenheimer properly served Prudential with notice of the subpoena duces tecum, and that Fed.R.Evid. 408 did not preclude the admission of evidence relating to the Saddlebrook incident. However, we agree with the district court's conclusion concerning Oppenheimer's waiver argument.

The Saddlebrook incident did not involve any alleged misrepresentations of a registered representative in connection with the purchase and sale of securities. It is an incident totally unrelated to the claims being made by Oppenheimer in the instant case and presents no issues of fact with respect to Prudential's liabilities for TMS transactions. Consequently, the district court did not err when it determined that the acent, did not result in a waiver of its right to claim that it had not assumed the liabilities of TMS.

Under New York law,[4] the purchaser of corporate assets is not responsible for the liabilities

---

[4]The Asset Purchase Agreement states, "[the] construction of this Agreement shall be governed ... by the law applicable to contracts made ... in the state of New York...." Accordingly, the district court analyzed the contract at issue under New York law, and none of the parties

of its predecessor unless (1) it expressly or impliedly assumes such liability; (2) the two corporations were merged into one; (3) the successor corporation is a mere continuation of its predecessor; or (4) the transaction was fraudulently executed to escape such obligations. *Diaz v. South Bend Lathe, Inc.,* 707 F.Supp. 97, 99 (E.D.N.Y.1989) (internal citations omitted). Therefore, regardless of the actions taken by Prudential in relation to the Saddlebrook incident, Prudential would not be liable for the TMS transactions unless its actions brought it within one or more of the four exceptions to the general proposition that a successor corporation is not liable for the acts of its predecessor corporation.

The district court analyzed each of these exceptions and found that none were applicable. Oppenheimer does not contest the district court's findings as to three of the exceptions, but she does challenge the district court's determination that the Asset Purchase Agreement did not indicate that Prudential expressly or impliedly assumed the liabilities of TMS.

Oppenheimer claims that the language of the Asset Purchase Agreement between Prudential and TMS is ambiguous with respect to whether or not Prudential assumed the liabilities of TMS. Accordingly, Oppenheimer argues that there is an issue of fact that should preclude summary judgment as to whether Prudential assumed the liabilities of TMS.

Whether a written agreement is ambiguous is a question of law to be resolved by the court. *Van Wagner Adv. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986). Oppenheimer argues that the following sections of the Asset Purchase Agreement create an ambiguity:

> 1(b) *Limitations.* Except as provided herein or in the Conversion Agreement, buyer will not acquire any of the assets of Seller or any of its subsidiaries and shall not assume any liabilities ... of Seller of any nature whatsoever....
>
> \* \* \* \* \* \*
>
> n. *Account Documentation.* Seller will take all actions necessary to assure that Buyer shall become the successor in interest in the account documentation of any non-objecting customer that relates to the business of Seller and its Subsidiaries.

disputes the district court's choice of law.

6

\* \* \* \* \* \*

> B. *Indemnity.* Seller hereby indemnifies Buyer and agrees to hold Buyer harmless against any and all loss, liability, obligation, damage, claim and expense of any nature whatsoever, including, without limitation, reasonable attorney's fees (collectively "Claims"), (I) arising from or in connection with the conduct of any aspect of the retail brokerage business conducted by Seller or its employees or agents at ... any of the adjusted premises.

Oppenheimer contends that these provisions, read together, indicate that when Prudential purchased the customer accounts it also intended to assume the attendant liabilities arising from those accounts. We disagree.

We find nothing ambiguous in the language of the Asset Purchase Agreement concerning what liabilities Prudential intended to assume. Under the "Limitations" language, it is clear that Prudential expressly stated that it was not assuming the liabilities of TMS. Neither the account documentation clause nor the indemnity clause creates an ambiguity on this point. In fact, the indemnity clause supports this interpretation because it indemnifies Prudential from "any and all loss ... arising from or in connection with the conduct of any aspect of the retail brokerage business conducted by [TMS]." Consequently, we affirm the district court's decision to grant Prudential's motion for summary judgment on the issue of successor-in-interest liability.

II. DTPA

The trial court dismissed Oppenheimer's DTPA claims because "[p]laintiff has failed to provide Prudential with the appropriate notice as required by Texas Business and Commerce Code § 17.505(a)." We need not address the sufficiency of the notice provided by Oppenheimer, because, regardless of the sufficiency of that notice, the proper remedy for insufficient notice is abatement not dismissal. "[I]f a plaintiff files an action for damages under the DTPA without first giving the required notice, and a defendant timely requests an abatement, the trial court *must* abate the proceedings for 60 days." *Hines v. Hash,* 843 S.W.2d 464, 469 (Tex.1992) (internal citations omitted) (emphasis added). Therefore, the district court erred when it dismissed, rather than abated, Oppenheimer's DTPA claims. Based upon this error, we must vacate the district court's dismissal of the DTPA claims and remand those claims for further consideration by the district court.

III. Dismissal of Common Law Fraud and Statutory Fraud Claims

A district court may dismiss a claim only when it "appears beyond doubt that the plaintiff can provide no set of facts in support of its claims that would provide a basis for relief." *Woodward v. Los Fresnos Indep. School Dist.,* 732 F.2d 1243, 1245 (5th Cir.1984) (internal citation omitted). The plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true. *Mitchell v. McBryde,* 944 F.2d 229, 230 (5th Cir.1991). This court reviews the dismissal of a plaintiff's claims on a de novo basis. *First Gibraltar Bank, FSB v. Smith,* 62 F.3d 133, 135 (5th Cir.1995) (internal citation omitted).

Oppenheimer's claim of statutory fraud was based upon Prudential's alleged violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Commission. In order to state a claim under Rule 10b-5, a plaintiff must allege, at a minimum, that the defendant made (1) a false misrepresentations or omission, (2) of a material fact, (3) knowing its falsity and intending that the plaintiff rely on it, (4) that the plaintiff justifiably relied on the misrepresentation or omission, and (5) suffered damage resulting from this reliance. *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).

The elements that are necessary to state a claim of common law fraud are basically identical. "The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990) (internal citations omitted).

In the instant case the only element that distinguishes statutory fraud from common law fraud is the additional requirement for statutory fraud that the alleged fraudulent activity must be made in connection with a particular purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1315 (5th Cir.1977), *cert. denied sub nom. Walter E. Heller & Co. v. First Virginia*

8

*Bankshares,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Because this additional element is not at issue on appeal, we will address the dismissal of Oppenheimer's claims of statutory and common law fraud together.

Oppenheimer's allegations of fraud are based upon two alleged occurrences.[5] Her first allegation of fraud concerns Green's alleged misrepresentation to Oppenheimer that she would not incur a sales charge on the transfer of funds from Massachusetts Financial Services Government Securities High Yield Fund ("MFS") to the American Funds Group. In the second alleged instance of fraud Oppenheimer contends that she instructed Green to purchase Fund A, but that Green disregarded her instructions and purchased Fund B.

A. Hidden Sales Charge

The district court dismissed Oppenheimer's statutory fraud claim relating to the alleged hidden sales charge based upon its finding that Oppenheimer had failed to provide the amount of the hidden sales charge or when it occurred "despite being ordered to do so by this Court in granting Prudential's motion for a more definite statement." Similarly, the district court, citing Oppenheimer's failure to comply with FED.R.CIV.PROC. 9, dismissed her claim of common law fraud.

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." FED.R.CIV.PROC. 9(b). We agree with the district court and find that Oppenheimer's failure to allege when the sales charge was incurred or the extent of her damages related to this alleged charge justified the district court in dismissing her claims of statutory and common law fraud. *See Hayduk v. Lanna,* 775 F.2d 441, 445 (1st Cir.1985) (dismissal of fraud counts after plaintiffs had opportunity to amend was justified where plaintiffs were notified before amending that allegations failed to meet the particularity requirement of Rule 9(b)).

---

[5]Oppenheimer's brief also addresses the trial court's decision to grant Prudential's motion for summary judgment relating to her allegations which seek to impose liability on Prudential for fraudulent transactions occurring prior to Prudential's acquisition of TMS. However, because we have already determined that there is no successor-in-interest liability, we need not address these alleged instances of fraud.

B. Funds A & B

Oppenheimer's other alleged instance of fraud is based upon her contention that she instructed Green to purchase Fund A but that he purchased Fund B instead. However, Oppenheimer failed to allege that she was damaged by this alleged fraudulent act despite being specifically instructed to do so by the court. Because of her failure to allege any damage associated with this transaction, the district court was correct in dismissing her claims of statutory and common law fraud based upon this transaction. *Id.*

IV. Oppenheimer's Other Claims

Oppenheimer also challenges the district court's order dismissing her claims of breach of fiduciary duty, breach of contract, and negligence. However, she has not provided this court with any sound argument or citation to relevant authority as to why we should reverse the district court's dismissal of these claims. Consequently, we affirm the dismissal of these claims as well. *See Randall v. Chevron U.S.A., Inc.,* 13 F.3d 888 (5th Cir.) (in the absence of logical argumentation or citation to authority, appellate court may decline to reach the merits of appellant's claims), *cert. denied,* --- U.S. ----, 115 S.Ct. 498, 130 L.Ed.2d 408 (1994).

CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on the issue of Prudential's liability as a successor-in-interest and the dismissal of Oppenheimer's claims of statutory fraud, common law fraud, breach of contract, breach of fiduciary duty, and negligence. We VACATE the dismissal of Oppenheimer's DTPA claims and REMAND those claims for further proceedings consistent with this opinion.