# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2024

Lyle W. Cayce
Clerk

———————

No. 23-50600

———————

Deroald Hopkins,

*Plaintiff—Appellant*,

*versus*

Wayside Schools,

*Defendant—Appellee*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-334

———————————————————

Before King, Stewart, and Higginson, *Circuit Judges*.

Per Curiam:[*]

In January 2020, Plaintiff-Appellant Deroald Hopkins was terminated from his employment with Wayside Schools, a nonprofit organization that operates open-enrollment charter schools in Texas. Hopkins alleges that he was terminated for reporting mismanagement of federal funds, in violation of 41 U.S.C. § 4712. He further alleges that he was terminated due to his race,

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

in violation of 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment.

The district court dismissed Hopkins's claims, concluding that Wayside Schools is entitled to Eleventh Amendment sovereign immunity as an "arm of the state." We disagree, finding that Wayside Schools has not met its burden of proving that it is entitled to Eleventh Amendment immunity. Accordingly, we REVERSE the district court's dismissal of Hopkins's whistleblower-retaliation claim under 41 U.S.C. § 4712, and we relatedly REVERSE the district court's order striking this claim from the operative complaint. However, we AFFIRM the dismissal of Hopkins's race-discrimination claim brought pursuant to 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983, agreeing with the district court that Hopkins has not stated a plausible claim for relief.

## I.

### A.

The following facts originate from Plaintiff-Appellant Hopkins's first amended complaint. Deroald Hopkins, an African-American man, started working for Wayside Schools ("Wayside") as its Chief Operations Officer/Chief Financial Officer in November 2017. Hopkins was the only management-level African-American employee at Wayside. Hopkins initially received positive feedback for his work, including a strong performance evaluation.

Soon after his employment began, Hopkins purportedly started discovering "numerous financial errors, mismanagement, and misappropriation of both state and federal funds received by Wayside." For example, Hopkins found that federal funding was being miscoded, resulting in these funds being utilized for improper purposes. He further discovered

that Wayside was commingling operational funds, state and federal funds, and debt service funds in one account.

Hopkins reported this "gross mismanagement of funds" to Wayside's superintendent and finance committee, and these financial issues were discussed at board meetings, committee meetings, and individual meetings up until November 2019. However, according to Hopkins's complaint, instead of taking corrective action, Wayside "put a target on [Hopkins's] back" and began engaging in retaliation.

First, Katherine Fugate, the Director of Wayside's Special Education Program, made unsubstantiated or false claims that Hopkins (1) misappropriated federal funds, (2) made disparaging comments about her, and (3) ignored and excluded her. Then, on January 7, 2020, Hopkins was terminated by Superintendent Matthew Abbott and John Troy, Chairman of the School Board. The reasons provided to Hopkins for his termination were a "lack of clear communication and reliable board reporting," "submitting an incorrect budget amendment," and "other financial errors and failures." Hopkins claims that he was actually terminated due to his whistleblowing efforts, "which brought to light all of these financial issues that had been accumulating over previous fiscal years." Furthermore, Hopkins points out that two non-African-American outside auditors who also reported financial mismanagement were not fired or reprimanded.

In addition, Hopkins outlines other instances of mistreatment that he claims were racially discriminatory. On one occasion, Superintendent Abbott, who is white, responded to Hopkins's report of financial issues by "call[ing] [Hopkins] a jerk and then mutter[ing] several other insulting names under his breath." Hopkins also alleges that Abbott "would yell at him and engage in name-calling" when Hopkins reported financial mismanagement. According to Hopkins, no non-African-American

No. 23-50600

management-level employees were subjected to similar demeaning treatment from Abbott.

**B.**

On April 15, 2021, Hopkins filed suit against Wayside in the U.S. District Court for the Western District of Texas. The original complaint alleges that Hopkins was subjected to whistleblower retaliation in violation of 41 U.S.C. § 4712, as well as race discrimination in violation of 42 U.S.C. § 1981. Hopkins's § 1981 claim was brought against Wayside pursuant to 42 U.S.C. § 1983.[1]

On June 15, 2021, Wayside filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In its motion, Wayside asserted Eleventh Amendment sovereign immunity as a defense to Hopkins's whistleblower-retaliation and race-discrimination claims. Wayside further argued that Hopkins failed to plead a plausible race-discrimination claim under 42 U.S.C. § 1981. Then, seemingly interpreting Hopkins's reference to 42 U.S.C. § 1983 as a separate cause of action, Wayside argued that Hopkins failed to plead a plausible race-discrimination claim under § 1983.[2]

---

[1] *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) ("[T]he express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."). Because we find that Hopkins did not plead a plausible § 1981 race-discrimination claim, we need not and do not decide whether Wayside is a "state actor" (for the purpose of § 1983), an issue that was never disputed below or on appeal. Only Hopkins's § 4712 claim remains following this appeal, and Wayside has only opposed that claim on Eleventh Amendment sovereign immunity grounds.

[2] In the proceedings below, there appears to have been some confusion regarding race-discrimination claims brought pursuant to § 1983. Because § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights

No. 23-50600

The district court agreed with Wayside. In an order granting Wayside's motion to dismiss, the court held that Hopkins's 41 U.S.C. § 4712 and 42 U.S.C. § 1981 claims are barred by the Eleventh Amendment, since Wayside is an "arm of the state for purposes of sovereign immunity." Then, also seeming to interpret Hopkins's reference to § 1983 as a separate cause of action, the district court concluded that Hopkins's complaint failed to state a plausible "Section 1983 discrimination claim."

At the end of its order granting Wayside's motion to dismiss, the district court granted Hopkins an opportunity to amend his complaint, concluding that an amendment may not be futile "if Hopkins can plead, in good faith, a specific factual basis for his Section 1983 discrimination claim." Hopkins notes that the district court's proceedings appear to have contained some inconsistencies regarding the application of Eleventh Amendment sovereign immunity. Unless waived by the state, Eleventh Amendment sovereign immunity remains intact for claims brought pursuant to § 1983. *See Richardson v. S. Univ.*, 118 F.3d 450, 453 (5th Cir. 1997); *NiGen Biotech,*

---

elsewhere conferred,'" there is no such thing as a freestanding § 1983 race-discrimination claim. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). It is true that this court has referred to "§ 1983 claims asserting racial discrimination in the employment context." *See, e.g.*, *Caldwell v. Lozano*, 689 F. App'x 315, 321 (5th Cir. 2017); *Lee v. Conecuh Cnty. Bd. of Educ.*, 634 F.2d 959, 961 (5th Cir. 1981) (referencing a "case of racial discrimination in employment under section 1983"). In these cases, however, we generally utilized the term "§ 1983" as shorthand for the plaintiffs' constitutional claims alleging violations of the Equal Protection Clause of the Fourteenth Amendment. *See Caldwell*, 689 F. App'x at 321; *Lee*, 634 F.2d at 962.

Unlike Wayside and the district court, we do not read Hopkins's original complaint to indicate that Hopkins cited § 1983 to assert an additional race-discrimination cause of action, such as a constitutional claim. Rather, it appears that Hopkins cited § 1983 as a procedural vehicle to assert his § 1981 claim against Wayside. Indeed, in a motion for clarification, Hopkins expressed confusion with Wayside's and the district court's reading of his complaint, noting that he "did not assert a Section 1983 discrimination claim because Section 1983 does not provide any substantive rights."

*L.L.C. v. Paxton*, 804 F.3d 389, 393–94 (5th Cir. 2015). Accordingly, as Hopkins noted in a motion for clarification, if Wayside is entitled to Eleventh Amendment sovereign immunity, any amendment to Hopkins's factual pleadings related to a § 1983 claim would be futile.[3]

Nevertheless, Hopkins filed a first amended complaint, which additionally alleged that Hopkins was terminated in violation of the Equal Protection Clause of the Fourteenth Amendment. Shortly thereafter, Wayside filed a renewed motion to dismiss. Wayside also moved for the district court to strike from the first amended complaint Hopkins's 41 U.S.C. § 4712 and 42 U.S.C. § 1981 claims, since the district court had previously held that these claims are barred by Eleventh Amendment sovereign immunity.

On March 8, 2023, this court issued its opinion in *Springboards to Education, Inc. v. McAllen Independent School District*, 62 F.4th 174 (5th Cir. 2023). In *Springboards*, we held that IDEA Public Schools ("IDEA"), another nonprofit organization operating charter schools in Texas, is not an "arm of the state" entitled to assert Eleventh Amendment sovereign

---

[3] Wayside, in its reply brief in support of its motion to dismiss, stated that it "does not claim that it is immune from any specific claims under 42 U.S.C. § 1983." The district court may have interpreted this statement as Wayside expressing consent to be sued via § 1983. We note that a state's consent to suit against it in federal court must be "unequivocally expressed," and we would find it difficult to conclude that the State of Texas, via this statement in Wayside's reply brief, "unequivocally expressed" consent to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Rather, this statement appears to be the result of Wayside conflating "state actors" in the context of § 1983 (which include local government entities) and "arms of the state" in the context of Eleventh Amendment sovereign immunity.

Regardless, since we ultimately conclude that Wayside has not proved that it is entitled to Eleventh Amendment sovereign immunity, and that Hopkins's race-discrimination claim brought pursuant to § 1983 should be dismissed for failure to state a claim, we need not address this issue of consent.

immunity. *Id.* at 183. Shortly after *Springboards* was issued, Hopkins moved for the district court to reconsider its holding on Wayside's sovereign immunity.

On August 11, 2023, the district court issued an order disposing of Hopkins's motion for reconsideration and Wayside's renewed motion to dismiss. Addressing Hopkins's motion for reconsideration first, the district court reevaluated Wayside's assertion of sovereign immunity in light of *Springboards*'s precedent, and it affirmed its prior holding that Wayside is an "arm of the state." Turning to Wayside's motion to dismiss, the district court concluded that Hopkins's amended complaint fails to state a plausible race-discrimination claim. Finally, the district court struck the portion of Hopkins's first amended complaint alleging his whistleblower-retaliation claim brought pursuant to 41 U.S.C. § 4712. Hopkins timely filed a notice of appeal.

## II.

We review *de novo* a district court's grant of a motion to dismiss brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.*

A motion to dismiss brought pursuant to Rule 12(b)(1) challenges the court's subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Because Eleventh Amendment sovereign immunity deprives a federal court of jurisdiction to hear a suit against a state, a defendant's motion to dismiss asserting Eleventh Amendment sovereign immunity is properly brought under Rule 12(b)(1). *See Warnock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996). Subject-matter jurisdiction may be addressed by considering: "(1) the

complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161. In reviewing a district court's dismissal under Rule 12(b)(1), "we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

A motion to dismiss brought pursuant to Rule 12(b)(6) is appropriately granted when the complaint fails to state a legally cognizable claim. *Ramming*, 281 F.3d at 161 (citing FED. R. CIV. P. 12(b)(6)). As with our review of dismissals under Rule 12(b)(1), "[t]he plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 194 (5th Cir. 1996). That said, to survive a Rule 12(b)(6) challenge, a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.

## III.

We begin by addressing Wayside's invocation of Eleventh Amendment sovereign immunity. "The Eleventh Amendment recognizes the background constitutional principle that states, as separate sovereigns, are inherently immune from suit without their consent." *Springboards*, 62 F.4th at 178. A state's sovereign immunity extends to "so-called arms of the state, entities which are effectively the state itself because 'the state is the real, substantial party in interest' to the lawsuit." *Id.* (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 681 (5th Cir. 1999)).

To determine whether an entity is an "arm of the state," this court applies a six-part balancing test articulated in *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986). Those factors are:

> (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether it has the right to hold and use property.

*Springboards*, 62 F.4th at 178–79 (citing *Clark*, 798 F.2d at 744–45). Though we consider these factors "as a whole," we have noted that "[t]he second factor carries the most weight, while factors five and six are of lesser importance." *Id.* at 179. Wayside bears the burden of proof in demonstrating that it is an arm of the state entitled to Eleventh Amendment sovereign immunity. *See id.*; *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000).

Hopkins offers a few preliminary arguments to circumvent the *Clark* balancing test, but none of these arguments are persuasive. For instance, Hopkins argues that Texas state law does not consider charter schools to be governmental entities for the purpose of adjudicating lawsuits brought pursuant to 42 U.S.C. § 1981 or 41 U.S.C. § 4712. He further argues that Texas state law grants charter schools governmental immunities "to the same extent as school districts, which . . . are not entitled to Eleventh Amendment immunity."[4] We find that these arguments are better addressed

---

[4] While we have noted that school districts are generally not considered arms of the state, *see Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 596 (5th Cir. 2006), this court does not apply a blanket rule that school districts are not entitled to Eleventh Amendment sovereign immunity. When a school district asserts Eleventh Amendment sovereign immunity, this court still applies the *Clark* factors to determine whether the school district is an arm of the

within our analysis of the first *Clark* factor, which examines how Texas statutes and case law view the entity asserting sovereign immunity. In other words, these arguments presented by Hopkins fit within the *Clark* analysis, and they do not provide us a reason to dispense with the *Clark* test altogether.[5]

Before delving into the *Clark* factors, it is worth noting at the outset the import of this court's prior *Springboards* decision in guiding our analysis. This circuit's rule of orderliness generally binds us to the holdings of a prior panel absent an intervening change in law. *Mendez*, 823 F.3d at 335; *see also United States v. Elizalde-Perez*, 727 F. App'x 806, 809 n.3 (5th Cir. 2018) ("[U]nder the rule of orderliness, a prior panel's interpretation of law remains binding so long as it has not specifically been overridden by statutory amendment, this court sitting en banc, or the Supreme Court."). Accordingly, we decline to consider the parties' arguments to the extent that

---

state. *See, e.g.*, *Springboards*, 62 F.4th at 183; *Black*, 461 F.3d 596–98; *Minton v. St. Bernard Par. Sch. Bd.*, 803 F.2d 129, 131–32 (5th Cir. 1986).

[5] Hopkins argues that Congress has abrogated state sovereign immunity for whistleblower claims brought pursuant to 41 U.S.C. § 4712 by enacting 42 U.S.C. § 2000d-7. Section § 2000d-7(a) abrogates Eleventh Amendment sovereign immunity in lawsuits alleging "a violation of . . . any . . . Federal statute prohibiting discrimination by recipients of Federal financial assistance." As Wayside notes, this court recently held in *Texas Education Agency v. United States Department of Education*, 992 F.3d 350, 360–61 (5th Cir. 2021), that Eleventh Amendment sovereign immunity remains intact in suits brought pursuant to 41 U.S.C. § 4712. Hopkins argues that "the Fifth Circuit [in *Texas Education Agency*] did not address why [§] 2000d-7 does not waive [Eleventh Amendment] immunity for § 4712." But this circuit's rule of orderliness generally prevents us, as a three-judge panel, from departing from the holding of another panel absent an "intervening change in law," even where a party raises "new arguments that were not presented to a prior panel." *Mendez v. Poitevent*, 823 F.3d 326, 335 (5th Cir. 2016).

In any event, because we hold that Wayside has not proved that it is an arm of the state entitled to Eleventh Amendment sovereign immunity, we decline to opine on any potential interaction between 41 U.S.C. § 4712 and 42 U.S.C. § 2000d-7.

they ask us to relitigate *Springboards*. However, the charter school system in *Springboards* is not the same entity as the charter school system here, so we are open to distinguishing *Springboards* where appropriate. In practice, our adherence to *Springboards* follows this principle: Where the *Springboards* court reached its holdings based on principles that apply to charter schools *generally*, we follow suit, unless the parties present a compelling reason to distinguish *Springboards* from the present case. Where the *Springboards* court reached its holdings based on facts pertaining specifically to IDEA, we must perform our own analysis based on facts pertaining to Wayside.

With that guiding principle explained, we turn to the *Clark* factors.

**A.**

The first *Clark* factor focuses on whether state statutes and case law view the entity asserting Eleventh Amendment sovereign immunity as an arm of the state. *Clark*, 798 F.2d at 744. Here, this factor clearly weighs in favor of immunity. As the *Springboards* court noted, the Supreme Court of Texas held in *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521 (Tex. 2020), that because "open-enrollment charter schools act as an arm of the State government," they are entitled to state governmental immunities. *Springboards*, 62 F.4th at 179 (quoting *El Paso Educ.*, 602 S.W.3d at 529–30).[6] The Supreme Court of Texas reached this conclusion

---

[6] Hopkins highlights that the Supreme Court of Texas's decision in *El Paso Education* provided that "open-enrollment charter schools and their charter-holders have governmental immunity *to the same extent as public schools*." *See El Paso Educ.*, 602 S.W.3d at 534 (emphasis added). Therefore, in Hopkins's view, because charter schools are similar to school districts for the purpose of *Clark* factor one, and because school districts are generally not entitled to Eleventh Amendment sovereign immunity, *Clark* factor one weighs against immunity.

This argument is flawed for a few reasons. First, as Wayside points out, Hopkins conflates state common-law governmental immunity, as decided by the Supreme Court of Texas, and Eleventh Amendment sovereign immunity, which we analyze under the *Clark*

notwithstanding the Texas Legislature's more limited view of charter schools' immunities. *See Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 753 (Tex. 2018) ("Sections 12.1056(a) and 12.1058(c) [of Texas's Education Code] provide that *under a statute specifically applicable to charter schools, . . .* an open-enrollment charter school is as immune from liability and suit as a school district." (emphasis added)); *El Paso Educ.*, 602 S.W.3d at 529 n.36 (acknowledging the Supreme Court of Texas's prior jurisprudence related to § 12.1058(c)); *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 432 (Tex. 2016) ("[A]s the arbiter of common law, the judiciary has historically been, and is now, entrusted with defining the boundaries of the common-law doctrine and determining under what circumstances sovereign immunity exists in the first instance." (cleaned up)).

The *Springboards* court's disposition of this issue cited Texas authorities that address charter schools generally, and Hopkins has not presented any reasons to find that Wayside is factually distinct from IDEA with respect to this first *Clark* factor. The Supreme Court of Texas's holding

---

test. Second, Hopkins's argument appears to assume that school districts are unequivocally not entitled to Eleventh Amendment sovereign immunity as a matter of law. But as referenced above, when a school district asserts Eleventh Amendment sovereign immunity, we still apply the *Clark* factors and address each claim of sovereign immunity on a case-by-case basis. *See supra* note 4. And third, Hopkins's argument appears to assume that because school districts are generally not entitled to Eleventh Amendment sovereign immunity, applying the *Clark* test to a school district would result in every *Clark* factor weighing against sovereign immunity. But this is not the case. In *Springboards*, this court also applied the *Clark* factors to a Texas independent public school district, and we determined that *Clark* factor one weighed *in favor of* Eleventh Amendment sovereign immunity. 62 F.4th at 183. Thus, even if we accepted as true Hopkins's view that charter schools and public school districts should be considered the same entities for the purpose of *Clark* factor one, this factor would still weigh in favor of Eleventh Amendment sovereign immunity because we have held that the State of Texas also considers public school districts to be arms of the state.

that open-enrollment charter schools are arms of the state entitled to state governmental immunities, though not dispositive as to Eleventh Amendment sovereign immunity, pushes *Clark* factor one in favor of immunity. *See Springboards*, 62 F.4th at 179.

## B.

*Clark* factor two looks at the entity's funding. This is the most important factor, since "one of the Eleventh Amendment's central purposes is to protect state treasuries from involuntary liability." *Id.* at 180. This inquiry has two components: We consider both the state's liability for a judgment rendered against the entity and the state's liability for general debts and obligations. *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 328 (5th Cir. 2002).

To determine whether the state would be liable for a judgment, we examine the degree to which it funds the defendant, whether it indemnifies the defendant, and the extent to which it restricts the defendant's use of state-provided funds. *Springboards*, 62 F.4th at 179. Beginning with the degree to which the state funds Wayside, this consideration clearly weighs in favor of immunity. It is undisputed that state funding constitutes the "lion's share" of Wayside's budget. *See Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 693 (5th Cir. 2002). Based on figures from the fiscal year ending in June 2020, Wayside asserts that 89 percent of its funding comes from the state. The remaining 11 percent, which amounted to $2,470,952 for that fiscal year, comes from local and federal sources. IDEA, on the other hand, received roughly a quarter of its funding from local and federal sources, which this court in *Springboards* described as "ample funding" that "belie[d]

the assertion that Texas would be 'directly responsible for a judgment.'" 62 F.4th at 180 (quoting *Stratta v. Roe*, 961 F.3d 340, 354 (5th Cir. 2020)).[7]

While Wayside is undoubtedly dependent on the State of Texas in maintaining its day-to-day operations, other considerations related to Texas's potential liability for a judgment weigh against immunity. For instance, Wayside, like IDEA in *Springboards*, admits that its state funding is "earmarked." *See* Tex. Educ. Code § 12.107. In *Springboards*, this court held that the receipt of earmarked funds, which "come[] with state-imposed restrictions on how the funds may be spent," weighs against immunity. 62 F.4th at 180–81 (collecting cases). On appeal, Wayside contends that the *Springboards* court got this issue wrong, and that the state funds received by charter schools "are not earmarked such that they cannot be used to pay for a judgment." But while Wayside argues that charter schools have "broad discretion" to use these funds, it has not pointed to any evidence of state funds actually being utilized to satisfy a judgment against a charter school. Accordingly, we are not inclined to part ways with our colleagues on the *Springboards* court on this issue.

Additionally, Wayside has not pointed to any evidence that it is entitled to indemnity from the State of Texas, which further weighs against immunity. *See Springboards*, 62 F.4th at 180; *Vogt*, 294 F.3d at 693. And, even if it would be possible for Texas to provide additional unrestricted funds to satisfy a judgment, this court has "rejected the argument that the 'remote

---

[7] IDEA received $98 million in funding from local and federal sources in one year, while Wayside received about $2.5 million in funding from local and federal sources in one year. *See Springboards*, 62 F.4th 180. Much of this disparity appears to be a matter of scale. Considering that IDEA's local and federal funding amounted to roughly a quarter of its total funding, it appears that IDEA was bringing in several hundreds of millions of dollars annually. *See id.* Wayside, in contrast, received about $22.4 million in total revenues during one fiscal year.

possibility that the state will elect to pay a judgment' constitutes a threat to the state treasury." *Springboards*, 62 F.4th at 181 n.5 (quoting *Hudson*, 174 F.3d at 689); *see also Vogt*, 294 F.3d at 693 ("[W]e do not consider 'a state's voluntary, after-the-fact payment' of a judgment to be a liability against the state's treasury." (quoting *Williams v. Dall. Area Rapid Transit*, 242 F.3d 315, 321 (5th Cir. 2001))). Plus, Wayside has not "provide[d] any evidence that Texas regularly provides money to satisfy liabilities, despite having no obligation to do so." *See Springboards*, 62 F.4th at 181 n.5.

Hopkins provides an additional point of consideration that was not addressed by the *Springboards* court: He contends that Wayside has school legal liability insurance and employment practices liability insurance with limits of one-to-two million dollars. To illustrate the specific details of Wayside's insurance policy, he points to an insurance policy proposal for 2019–2020, as well as Wayside's publicly available financial statements, which indicate that Wayside pays for "[i]nsurance and bonding." Hopkins argues that the existence of an insurance policy suggests that "[Wayside's] insurance rather than state funds would pay a judgment."

As Hopkins points out, this court has held that an entity's liability insurance may weigh against immunity. *See Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 346 (5th Cir. 1998) (noting that the defendant entity's insurance policies prevented the State of Louisiana from paying judgments on behalf of the entity); *Black*, 461 F.3d at 597 (noting that a potential judgment against the defendant school district "would not burden the public fisc," because the expense would be covered, in part, by excess liability insurance).

Granted, Hopkins's evidence of Wayside's insurance policy is not particularly strong. Even if we accept as true Hopkins's claim that Wayside has an insurance policy that would cover a judgment, we can only speculate

as to how the premiums are paid, and whether the policy's limits adequately cover Wayside's liability. However, it is worth noting that since July 2021, Hopkins has repeatedly argued that *Clark* factor two weighs against immunity primarily due to Wayside's professional liability insurance. To date, Wayside has *never* rebutted this argument, including during this appeal. Thus, although Hopkins's insurance-based argument is largely speculative (which makes some sense, considering that discovery was stayed), it is essentially uncontested, and we therefore afford it some weight.

Turning to "the state's liability for general debts and obligations," *Perez*, 307 F.3d at 328, our analysis mirrors that of the *Springboards* court. Wayside, like IDEA, cannot generate its own revenue by levying taxes, which counsels in favor of immunity. *See Springboards*, 62 F.4th at 181 (citing Tex. Educ. Code § 12.102(4)). Instead, Wayside can issue bonds, which are guaranteed by the state. Tex. Educ. Code § 45.052. However, this court noted in *Springboards* that a state's liability "in guaranteeing a state authority's notes and bonds" has only an "ancillary effect on the state treasury." 62 F.4th at 181 (internal quotations omitted). Therefore, we find that these considerations weigh in favor of immunity, but only slightly.

In summary, *Clark* factor two presents a close call. Given Wayside's dependence on state funding, we find it difficult to share our *Springboards* colleagues' confidence that "any risk of a judgment's being paid from state funds is remote." *Springboards*, 62 F.4th at 180. On the other hand, Wayside has not presented compelling evidence indicating that its potential legal liabilities cannot be covered by its non-state funding, in addition to a purported insurance policy, the existence of which Wayside has never attempted to refute. It is additionally unclear whether Wayside's state funding can be used to pay a judgment, and whether Texas has any obligation to assist Wayside should its non-state funding prove inadequate.

No. 23-50600

In light of these uncertainties, our disposition of *Clark* factor two ultimately hinges on the burden of proof. At this juncture, we find that Wayside has not met its burden of establishing that *Clark* factor two weighs in favor of immunity. Wayside, as the party with the burden of proof (and as the party in possession of any relevant evidence), has only provided in support of its arguments for *Clark* factor two an affidavit describing Wayside's general funding composition. At best, Wayside has provided some indication that it *could* succeed in showing that *Clark* factor two weighs in favor of immunity. However, we cannot conclude that Wayside has successfully made such a showing at this time.[8]

## C.

*Clark* factor three considers whether the entity is autonomous or controlled by the state. "We look to the degree of independence enjoyed by the entity and its managers, as well as how its managers are appointed." *Springboards*, 62 F.4th at 181. The *Springboards* court's disposition of this issue rested entirely on findings that apply to charter schools generally. For instance, the *Springboards* court noted that "Texas pervasively regulates charter entities," and that "Texas courts have recognized that a charter

---

[8] We note that the Tenth Circuit faced a similar issue in *Hennessey v. University of Kansas Hospital Authority*, 53 F.4th 516 (10th Cir. 2022). In *Hennessy*, the Tenth Circuit applied its own "arm-of-the-state" standard, which includes examining "the amount of state funding the entity receives and consider[ing] whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Id.* at 528 (internal quotation omitted). The court concluded that limited evidence related to the defendant entity's finances and revenue streams precluded a full assessment of this factor. *Id.* at 533. Because the defendant bore the burden of proving that it was an arm of the state, "any uncertainty regarding [the defendant's] finances weigh[ed] against [the defendant's] position." *Id.* at 542.

We reach a similar conclusion here. Because Wayside has not proved that *Clark* factor two weighs in favor of immunity, we find that this factor weighs against Wayside, or, at best, is neutral.

school's charter is 'entirely contingent on State discretion.'" *Id.* (quoting *Tex. Educ. Agency v. Am. YouthWorks, Inc.*, 496 S.W.3d 244, 262 (Tex. App.—Austin 2016)). If a charter school violates its charter or state law, the State of Texas may revoke the school's charter, "reconstitute" the charter holder's governing body, withhold funding, or suspend the charter school's authority to operate. *See* Tex. Educ. Code § 12.115(a); *id.* § 12.1162(a)–(b). And, Texas evaluates charter schools annually to ensure that they are meeting state-mandated benchmarks. *See id.* § 12.1181. As the *Springboards* court concluded, these provisions show that Texas has "broad oversight and control" over charter entities, which counsels in favor of immunity. 62 F.4th at 181.

Hopkins provides no arguments distinguishing *Springboards* from the present case. Instead, he argues that charter schools and public school districts exercise the same amount of local autonomy. Therefore, in Hopkins's view, because charter schools are similar to school districts with respect to *Clark* factor three, and because school districts are generally not entitled to Eleventh Amendment sovereign immunity, *Clark* factor three weighs against sovereign immunity. Hopkins adopted a similar line of reasoning for *Clark* factor one, *see supra* note 6, and here, again, this argument misses the mark. The *Springboards* court, in applying the *Clark* factors to a Texas school district, held that *Clark* factor three weighs in favor of sovereign immunity due to Texas's "considerable oversight and control over its school districts." 62 F.4th at 184. Therefore, even accepting Hopkins's premise that charter schools are not significantly distinguishable from school districts with respect to *Clark* factor three, this factor still weighs in favor of sovereign immunity.

**D.**

The fourth *Clark* factor considers "whether the entity is concerned primarily with local, as opposed to statewide, problems." *Clark*, 798 F.2d at 745. Again, *Springboards* is dispositive on this issue, as its findings appear to pertain to charter schools generally. In *Springboards*, this court acknowledged that "education is a statewide concern," 62 F.4th at 182, but clarified that the relevant inquiry for this factor "focuses on the tasks undertaken by the particular defendant," *id.* (quoting *Vogt*, 294 F.3d at 695). Charter school systems, while addressing statewide concerns in the abstract, conduct the day-to-day task of operating local schools. *See id.* Because each school serves a geographically limited community, this factor weighs against sovereign immunity. *See id.*

Wayside does not explain how facts pertaining to its particular schools distinguish this case from *Springboards*. Instead, Wayside argues that the *Springboards* court erred in analyzing this factor. Namely, Wayside cites instances in which this court has held that individual entities serving local communities are nevertheless primarily concerned with statewide issues such as education and research. *See, e.g.*, *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 259 (5th Cir. 2020); *Sissom v. Univ. of Tex. High Sch.*, 927 F.3d 343, 349 (5th Cir. 2019); *United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.-Hous.*, 544 F. App'x 490, 498 (5th Cir. 2013). These cases do not, however, tip the scales; each one involved a defendant entity affiliated with the University of Texas System, a state agency that provides comprehensive educational and medical services available to all Texas residents. *See* Tex. Educ. Code § 65.02. For *Clark* factor four, the services provided by charter schools appear comparable to those provided by school districts, and this court has repeatedly held that school districts serve local interests. *See Springboards*, 62 F.4th at 184; *Black*, 461 F.3d at 597; *Minton*, 803 F.2d at 131–32.

Regardless, *Springboards* clearly addressed the issue of *Clark* factor four with respect to charter schools, and the parties have not presented a reason to conclude that Wayside is factually distinguishable with respect to this factor. Accordingly, we follow the *Springboards* court's guidance and hold that factor four weighs against immunity.

### E.

Factor five considers whether the entity can sue and be sued in its own name. *Clark*, 798 F.2d at 745. This ability points against immunity, though this factor is generally afforded little weight. *Springboards*, 62 F.4th at 182. Wayside's key authority on this issue is *Perez v. Region 20 Education Service Center*, 307 F.3d at 331. In *Perez*, this court noted that Texas's Education Code is silent as to whether the defendant entity, a regional Education Service Center, could sue and be sued in its own name. *Id.* In contrast, the Education Code expressly provides that school districts can sue and be sued. *Id.* (citing TEX. EDUC. CODE § 11.151(a)). Therefore, the *Perez* court held that factor five weighed "slightly in favor of immunity."

Hopkins notes that Wayside, like IDEA, is a nonprofit, and under Texas law nonprofits generally may sue and be sued. *See* TEX. BUS. ORGS. CODE § 2.101(1). However, the *Springboards* court distinguished *Perez* on alternative grounds, noting that IDEA conceded that it had a history of suing in its own name, which weighed against immunity. 62 F.4th at 182. Wayside argues that *Springboards* is clearly distinguishable on this point, as Wayside has not conceded that it has a history of suing in its own name. While Wayside's point is well taken, it is worth noting that this inquiry concerns whether the entity *can* sue and be sued; if IDEA can sue and be sued, it reasonably follows that Wayside, a similar entity, also possesses this ability. That said, a lack of evidence concerning Wayside "suing in its own name" does make *Springboards* somewhat distinguishable. *See id.*

Ultimately, it is difficult to conclude that factor five, which "carries little weight" to begin with, firmly moves the needle in either direction. *See id.* A fellow charter school system's history of litigation weighs against immunity. However, there appears to be some statutory ambiguity regarding charter schools' ability to sue and be sued, which, per *Perez*, weighs slightly in favor of immunity.[9] Accordingly, *Clark* factor five appears neutral.

## F.

Finally, factor six concerns whether the entity can hold and use property. *See Clark*, 798 F.2d at 745. Wayside, like IDEA in *Springboards*, points the court to § 12.128 of Texas's Education Code. As the *Springboards* court noted, § 12.128 provides that "[w]hile an open-enrollment charter school is in operation, the charter holder holds title to any property . . . and may exercise complete control over the property as permitted under the law." 62 F.4th at 183 (second alteration in original) (quoting Tex. Educ. Code § 12.128(b)). However, § 12.128 also provides that property purchased by a charter holder with state funds "is considered to be public property for all purposes under state law," and "is property of [the] state held in trust by the charter holder for the benefit of the students." Tex. Educ. Code § 12.128(a)(1)–(2). Plus, if a charter school ceases operations, the State "take[s] possession and assume[s] control of the property." *Id.* § 12.128(c)(1).

The *Springboards* court noted these restrictions, but nevertheless concluded that "[o]ur precedent rejects the argument that this factor points toward immunity where the entity held title but 'all of [the entity's] property

---

[9] To be clear, *statutory* ambiguity in *Clark* factor five weighs slightly in favor of immunity. In contrast, any *factual* uncertainties, like those present in *Clark* factor two, weigh against the party with the burden of proof, or are neutral. *Cf. Hennessey*, 53 F.4th at 542.

ultimately belong[ed] to the state.'" 62 F.4th at 182–83 (alterations in original) (quoting *Vogt*, 294 F.3d at 696). Because Texas law provides that the charter holder holds title to its property, the *Springboards* court held that this factor weighed against immunity. *Id.* at 183.

Wayside, again, does not distinguish *Springboards* from the case at bar. Instead, Wayside argues that the *Springboards* court erred by citing *Pendergrass v. Greater New Orleans Expressway Commission*, 144 F.3d at 347, a case that Wayside claims is distinguishable. We are not persuaded by Wayside's attempts to distinguish *Pendergrass*. For instance, Wayside points out that the court in *Pendergrass* noted that the defendant entity's property *could* revert to the state "at some time in the distant future," *id.* at 347, whereas Texas's Education Code provides that a charter school's property *shall* revert to the state if the school ceases to operate, Tex. Educ. Code § 12.128(c). But Wayside overstates the dissimilarity between these two premises; a charter school ceasing to operate—i.e., the condition that must be satisfied for the reversion of property to occur—is a possibility, not a certainty. And the remainder of Wayside's arguments on this point pertain to Texas's authority over charter schools; we credit these arguments in Wayside's favor in our analysis of *Clark* factor 3, but we find them unpersuasive in the context of this factor.

But even if we were persuaded by Wayside's efforts to distinguish *Pendergrass*, it likely would make little difference. While *Pendergrass* arguably may be distinguishable on this issue, *Springboards* is not. We follow our colleagues on the *Springboards* court and hold that factor six weighs against immunity.

\* \* \*

To review, factors one and three weigh in favor of immunity, factors four and six weigh against immunity, and factor five is neutral. In light of this

split, factor two, the weightiest factor, is decisive. Wayside has not met its burden of establishing that factor two weighs in favor of sovereign immunity, so this factor currently weighs against Wayside, or, at best, is neutral. Because only two factors definitively weigh in favor of sovereign immunity, we hold that Wayside has not met its burden of establishing that it is an arm of the state, and we REVERSE the district court's holding that Wayside is entitled to Eleventh Amendment sovereign immunity.

## IV.

Having concluded that Wayside has not proved that it is entitled to assert Eleventh Amendment sovereign immunity, we turn to the district court's holding that Hopkins failed to state a plausible race-discrimination claim. As described above, there appears to have been some confusion below as to Hopkins's causes of action in pleading a race-discrimination claim. But because our inquiry into intentional discrimination in employment is essentially the same for individual actions brought pursuant to 42 U.S.C. § 1981, the Equal Protection Clause of the Fourteenth Amendment (via 42 U.S.C. § 1983), and Title VII of the Civil Rights Act of 1964, the procedural issues that occurred below ultimately do not impact our analysis of the factual sufficiency of Hopkins's complaint. *See Lauderdale v. Texas Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007).

To establish a *prima facie* case of race discrimination in employment based on circumstantial evidence, Hopkins must establish that he:

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016) (internal quotation omitted).[10] Although Hopkins does not need to submit evidence to establish a *prima facie* case of race discrimination at this stage, he must "plead sufficient facts on all of the *ultimate elements* of a disparate treatment claim to make [his] case plausible." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (quoting *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016)).

Hopkins claims that he was subjected to race discrimination when Wayside terminated his employment. Because Hopkins has not alleged any facts directly indicating that he was terminated on the basis of his race, he must identify at least one "similarly situated" coworker outside his protected class who was treated more favorably "under nearly identical circumstances." *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). Hopkins and this similarly situated coworker must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and ha[d] essentially comparable violation histories." *See Lee*, 574 F.3d at 260.

Hopkins's complaint fails to provide any indication that a similarly situated coworker, under nearly identical circumstances (i.e., reporting financial mismanagement or taking some comparable action), was treated more favorably than Hopkins. The only comparators Hopkins points to are two outside auditors from McConnell & Jones, who also reported financial mismanagement and were purportedly not "fired or even reprimanded." But, as Wayside points out, these individuals were not Wayside employees;

---

[10] A plaintiff may, of course, use direct evidence to prove a case of intentional discrimination, but we have noted that "direct evidence is rare." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994).

rather, they were employees of a private independent accounting firm. While we cannot, at this stage, subject Hopkins's complaint to a "rigorous factual or evidentiary analysis," we can conclude that Hopkins has not pleaded sufficient facts indicating that a similarly situated coworker was treated more favorably under nearly identical circumstances. *See Cicalese*, 924 F.3d at 767; *see also Chhim*, 836 F.3d at 471 (affirming the dismissal of a plaintiff's complaint alleging discrimination, because the complaint did not contain facts suggesting that the employer "hired a less qualified, similarly situated applicant" over the plaintiff). Accordingly, Hopkins has not plausibly alleged that his termination constituted unlawful race discrimination.

Hopkins's complaint also alleges that Superintendent Abbott treated him differently from non-African-American management-level employees by "yell[ing] at him and engag[ing] in name-calling" when Hopkins reported financial mismanagement, and by "call[ing] [Hopkins] a jerk and then mutter[ing] several other insulting names under his breath" on one occasion after Hopkins referenced Wayside's financial issues.

A good case for comparison is *English v. Perdue*, 777 F. App'x 94 (5th Cir. 2019). In *English*, a plaintiff bringing sex- and age-discrimination claims alleged that his supervisor "ridiculed and berated him publicly," and "allegedly tolerated snide remarks toward [the plaintiff] by his coworkers." *Id.* at 97. This court noted that the plaintiff had "alleged a variety of inconsiderate and even mean conduct in his workplace," but found that "[n]one of his allegations plausibly show[ed] that his sex or age was the basis of the allegedly hostile conduct he experienced." *Id.* at 98. Accordingly, we affirmed the dismissal of the plaintiff's hostile-work-environment and disparate-treatment claims. *Id.* at 98, 99–100.

A similar conclusion is warranted here. Hopkins's complaint provides very few details about the purported mistreatment he experienced, only

alleging that Superintendent Abbott, on a few occasions, yelled at him and called him names. He has not alleged that any of these names were race-related. Without more, these "hostile remark[s]" do not plausibly show that Hopkins was mistreated on the basis of his race. *See id.* at 98. Furthermore, these incidents do not support a race-discrimination claim based on circumstantial evidence. While Hopkins alleges that similarly situated coworkers were not subjected to such name-calling, he has not alleged that any of these employees were treated more favorably under nearly identical circumstances. More specifically, Hopkins claims that Abbott engaged in yelling and name-calling when Hopkins reported Wayside's financial mismanagement, but Hopkins has not alleged that any of his similarly situated coworkers also reported financial mismanagement (or engaged in comparable conduct) and were not, like Hopkins, subjected to hostility.

Accordingly, we agree with the district court's conclusion that Hopkins failed to plausibly allege a race-discrimination claim, and we AFFIRM the district court's dismissal of Hopkins's claims brought pursuant to 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983.[11]

---

[11] The district court dismissed Hopkins's § 1981 claim based on Eleventh Amendment sovereign immunity, but we "may affirm on grounds other than those relied upon by the district court when the record contains an adequate and independent basis for that result." *Lauren C. ex rel. Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 374 (5th Cir. 2018) (quoting *Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1449 (5th Cir. 1992)). Because we adjudicate race-discrimination claims brought pursuant to § 1981 and the Equal Protection Clause under the same standard, affirming the dismissal of Hopkins's constitutional claim warrants the dismissal of his § 1981 claim based on the same underlying conduct. *See Lauderdale*, 512 F.3d at 166.

## V.

For the foregoing reasons, we REVERSE the district court's dismissal of Hopkins's whistleblower-retaliation claim under 41 U.S.C. § 4712 on the basis of Eleventh Amendment sovereign immunity, and we REVERSE the district court's order striking this claim from the operative complaint. We AFFIRM the dismissal of Hopkins's race-discrimination claim brought pursuant to 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983.